### NELSON v. FIRST NAT. BANK OF KILLINGLEY.

(Circuit Court of Appeals, Eigl 'h Circuit.   August 19, 1895.)

No. 543.

1. EVIDENCE—CERTIFICATE OF PROTEST—MINNESOTA STATUTE.
    In accordance with the provisions of the Minnesota statute (Gen. St. 1878, c. 26, § 8;  Gen. St. 1894, § 2275) making the certificate of protest of a bill or note of any notary public of that or another state evidence of the facts therein certified, such a certificate is competent evidence, in a federal court sitting in Minnesota, of the presentment, demand, dishonor, or notice of dishonor of a note drawn in Minnesota, and payable and protested in Connecticut.

2. BILLS AND NOTES—NOTICE OF DISHONOR.
    It is not essential that a notice of dishonor or of protest of a note should state in so many words that the holder looks to the indorser for payment, but a notice from which that fact may be reasonably inferred is sufficient.   A copy of the note and of the protest sent to the indorser constitutes such a notice.

3. SAME—PROTEST BY OFFICER OF BANK.
    Since the removal of the disqualification of interested witnesses, a notary who is an officer of a bank may legally protest paper belonging to it.

4. EVIDENCE—ADMISSION BY AGENT.
    A letter written in the ordinary course of business by a clerk in the office of one sought to be charged as indorser of a note, acknowledging the receipt of notice of the protest thereof, is competent evidence of the sending of the notice.

5. MEASURE OF DAMAGES—EXCHANGE OF COLLATERAL.
    Where the holder of an indorsed note has exchanged collateral, held to secure such note, without the indorser's consent, the measure of the indorser's damage is the difference between the value of the collateral originally held and that for which it is exchanged, at the time of the exchange.

6. EVIDENCE—VALUE OF CORPORATE STOCK.
    Upon the question of the value of stock in a corporation which has been placed in the hands of a receiver, under a statute of the state creating it, in proceedings for its dissolution as insolvent, the opinions of competent witnesses as to the value of the stock are admissible, as is also evidence of the amount and value of the assets and liabilities of the corporation at different times between the appointment of the receiver and the sale of the assets in accordance with the statutory requirements.

7. SAME.
    Upon the same question it is also admissible to prove the amounts realized at the sales made of the property of the corporation by the receiver, under the order of the court, in the regular course of the insolvency proceedings, though taking place at a time remote from that to which the inquiry as to the value of the stock relates.

8. SAME—COMPETENCY OF EXPERT.
    A witness ought not to be permitted to give an opinion as to the value of an article when it does not appear that he has acquired any correct information from which to form an opinion, or that he has formed any opinion whatever.

**9. PRINCIPAL AND SURETY—DELAY OF CREDITOR.**

A surety is not discharged by mere delay of the creditor in enforcing his remedy against the principal until it has become barred by the statute of limitations, when no agreement to extend the time of payment has been made, and the surety has had the right, at any time, either to pay the debt and enforce repayment from the principal, or to compel the principal himself to pay the debt.

## In Error to the Circuit Court of the United States for the District of Minnesota.

In September, 1884, the defendant in error, the First National Bank of Killingley, took, in renewal of a like note held by it that was then due, the promissory note of Dwight M. Sabin for $10,000, payable to his own order, and indorsed by himself, Charles N. Nelson, the plaintiff in error, and others. This note was made and dated at Stillwater, in the state of Minnesota, and was payable at the office of the defendant in error, in the state of Connecticut. The maker and indorsers of the note were citizens and residents of Minnesota. At the time this note was made, the bank held as collateral security for this debt $10,000 of the special preferred stock of Seymour, Sabin & Co., a corporation of Minnesota, guarantied by the Northwestern Manufacturing & Car Company, another corporation of that state. In the certificates which represented this special preferred stock, Seymour, Sabin & Co. agreed to pay a semiannual dividend of 7 per cent. per annum on the par value of this stock until July 1, 1892, and to pay to the holder thereof at that time its par value. The Northwestern Manufacturing & Car Company had guarantied the performance of this agreement. This stock was the property of Seymour, Sabin & Co., subject to the pledge to the bank; and, when the original loan was made, Seymour, Sabin & Co. received the proceeds of the loan. On February 23, 1885, the bank exchanged this stock for stock of the Minnesota Thresher Company, another corporation of Minnesota, which subsequently proved to be worthless.

The statutes of the state of Minnesota provided that, whenever a corporation of the state became insolvent, the proper district court of that state might sequestrate its property, appoint a receiver thereof, sell its assets, distribute the proceeds thereof among its creditors, and wind up the corporation. Gen. St. Minn. 1878, c. 76 (Gen. St. 1894, §§ 5889–5911). Under these statutes, the proper district court of the state of Minnesota had in May, 1884, adjudged that Seymour, Sabin & Co. and the Northwestern Manufacturing & Car Company were each insolvent, and had appointed a receiver of the property of each of them; and these receivers were in September, 1884, when the note in suit was made, and in February, 1885, when the collateral security was exchanged, in possession of all the property of these corporations, and were proceeding under the direction of the court to wind them up under the statutes.

The bank brought this action against Nelson as an indorser on this note, and alleged that the note had been presented, that its payment had been demanded, that it had been protested, and that Nelson had been notified of its dishonor at its maturity. The plaintiff in error, in his answer, denied presentment, demand, protest, and notice of dishonor, and alleged that he was, and that the bank knew that he was, a mere accommodation indorser of this note, and that it had exchanged the stock of Seymour, Sabin & Co., which was worth the face of the note and was pledged for its payment, for the worthless stock of the Minnesota Thresher Company, without his knowledge or consent, and had thereby released him from all liability on the note. The bank replied that Nelson was an indorser for value; that the exchange of the collateral security was made with his knowledge, consent, and approval; and that the stock of Seymour, Sabin & Co. and the guaranty of the Northwestern Manufacturing & Car Company were worthless at the time of the exchange. The evidence at the trial was conflicting upon the issues relative to the consent to and approval of the exchange of the collateral security by the plaintiff in error, and relative to the value of the guarantied stock of Seymour, Sabin & Co. at the time of the exchange; and these questions were submitted to the

jury under proper instructions, who returned a verdict against the plaintiff in error for the full amount of the note and interest. This writ was sued out to reverse the judgment entered upon that verdict, for the alleged errors referred to in the opinion of the court.

W. P. Warner (Harris Richardson, C. G. Lawrence, and Horace G. Stone, on the brief), for plaintiff in error.

M. D. Munn and J. M. Gilman, for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

Is the certificate of protest of a promissory note drawn in one of the United States, signed by residents of that state, and payable in another, competent evidence in the state of Minnesota of either the presentment, demand, dishonor, or notice of dishonor of the note? The first alleged error in the trial of this case is that the court below admitted in evidence the certificate of protest of the note in suit made by a notary public of the state of Connecticut. The objection urged to it is that the note stood upon the same footing as an inland bill of exchange, that such a bill requires no protest, and hence the certificate was not an official act, and is incompetent. This objection cannot be sustained on the ground that this was an inland bill or inland note, as distinguished from a foreign bill or foreign note. A bill of exchange drawn in one of the states of the United States, payable in another, is a foreign bill, under the settled interpretation of the commercial law in the national courts. Bank v. Daniel, 12 Pet. 32, 53, 54; Buckner v. Finley, 2 Pet. 586, 592; Dickens v. Beal, 10 Pet. 572, 579.

A more serious objection to the certificate is that the paper protested was not a bill of exchange at all, but a promissory note, and it is not necessary to protest such a note in order to charge the indorser. All that is required is that due presentment and demand shall be made, and that the indorser shall be seasonably notified that the note is dishonored, and that the holder looks to him for payment. Proof of such presentment, demand, and notice may be made by any competent witness, and the certificate of these facts by a notary is not indispensable to a recovery against an indorser. Nicholls v. Webb, 8 Wheat. 326, 331; Bay v. Church, 15 Conn. 15; 3 Rand. Com. Paper, § 1143. But it does not necessarily follow that the certificate of protest is incompetent evidence of presentment, demand, and dishonor, because a protest was unnecessary to charge the indorser. It has been held by eminent authority that the certificate of a notary public is competent evidence of the presentment and demand of payment of a promissory note under the common law, though a protest was unnecessary to charge the indorser. Williams v. Putnam, 14 N. H. 542; Bank v. Stackpole, 41 Me. 302.

It is the common practice of banks and business men to cause a notary public to protest such notes as that here in suit, and it is a wise and salutary custom. It tends to insure prompt and efficient action, definitely fixing the relation of the parties at the maturity of

the paper, and to preserve a correct and reliable record of their rights and liabilities. It was undoubtedly in view of these facts that the legislature of the state of Minnesota early provided that:

"The instrument of protest of any notary public appointed and qualified under the laws of this state, or the laws of any other state or territory of the United States, accompanying any bill of exchange or promissory note, which has been protested by such notary for non acceptance or non payment, shall be received in all the courts of the state as prima facie evidence of the facts therein certified." Gen. St. Minn. 1878, c. 26, § 8 (Gen. St. 1894, § 2275).

This statute is a conclusive answer to the objections to this certificate. Under it the certificate of protest in question would have been competent evidence in the courts of the state, whether a protest of the note was indispensable or not. Bettis v. Schreiber, 31 Minn. 329, 332, 17 N. W. 863. And the rules of evidence prescribed by the statute of a state are declared by act of congress to be "rules of decision in trials at common law in the courts of the United States," "except where the constitution, treaties, or statutes of the United States otherwise require or provide." Rev. St. § 721; Brandon v. Loftus, 4 How. 127; Sims v. Hundley, 6 How. 1, 6; Potter v. Bank, 102 U. S. 163, 165.

The notary public testified that, immediately after protesting the note, he mailed to the plaintiff in error, at the request of the bank, a copy of the note attached to a certificate over his hand and seal that he had protested the same for nonpayment. It is insisted that this notice was insufficient to charge the indorser, because it does not expressly state that the bank looks to him for payment. The objection is untenable. For what other purpose could the plaintiff in error have inferred that this notice was sent to him by the holder of this note? There is no hard and fast rule that requires the notice to state in so many words that the holder looks to the indorser for payment of the note. A notice of dishonor or of protest of the paper from which it may be reasonably inferred that the holder intends to look to the indorser for payment is sufficient notice of that intention, and no other inference could be reasonably drawn from this notice. A notice of nonpayment and protest sent to the indorser by the holder of the note is, by necessary implication, an assertion by the holder of his right to collect of the indorser. Bank v. Carneal, 2 Pet. 543, 553; Mills v. Bank, 11 Wheat. 431, 436.

It is argued that the certificate of protest and the notice were incompetent, because the notary was the cashier of the bank that held the note. It is true that, when the rule prevailed which disqualified any party interested in an action from testifying in the cause, some of the courts held that a party in interest could not protest commercial paper, on the ground that, inasmuch as he could not testify to the presentment, demand, and notice, he was disqualified from making evidence of these facts by his certificate. Bank v. Cox, 21 Wend. 119; Bank v. Porter, 2 Watts, 141. But, in the circuit courts of the United States, interest in the litigation no longer disqualifies a witness; and this rule falls with its reasoning. A notary public who is the cashier of a bank may now legally protest its paper.

v. 69 f. no. 9—51

It is assigned as error that the trial court admitted in evidence the following letter:

"Stillwater, Minn., Feb. 27, 1885.

"H. N. Clemons, Esq., Danielsville, Ct.—Dear Sir: Yours of 21st inst., inclosing notice of protest, received. Mr. Nelson is now East, at Boston, I think; and I forwarded the same to him.

"Yours, resp'y                           J. A. Phipps, for C. N. N."

Mr. Clemons was the notary public who testified that he protested the note, and mailed the notice of protest on February 21, 1885, directed to the plaintiff in error at Stillwater, Minn., where he lived. This letter of Phipps was the answer he received. Testimony had been introduced tending to prove that J. A. Phipps, who signed the letter, was at its date a clerk in the office of the plaintiff in error, employed by the C. N. Nelson Lumber Company, a corporation of which Nelson was president. It was necessary for the defendant in error to prove that it had used reasonable diligence to notify Nelson of the dishonor of the note in order to charge him as an indorser. For this purpose, the testimony of the notary that he mailed the notice, addressed to him at his proper post-office address, was competent. But the written admission of the clerk in the office of the plaintiff in error that the notice was received there, made at the time and in the usual course of business, was certainly not incompetent evidence of the diligence of the bank, and it is as convincing proof to our minds that the notice was actually sent as the testimony of any witness could be. The admission of the receipt of a letter by a clerk in the office of a principal who has authorized him to receive his letters may well be deemed to be the admission of his principal.

One of the chief defenses of the plaintiff in error was that the $10,000 of guarantied stock of Seymour, Sabin & Co. was worth the full amount of the note on February 23, 1885, and that the bank exchanged it on that day for the worthless stock of the Minnesota Thresher Company without his consent. His claim was that he was a surety for the maker of this note, and that this action of the bank absolutely released him, regardless of the value of the security exchanged. The court, however, held during the trial, and at its close charged the jury, that the bank was liable to him on account of this exchange for the damage he had sustained thereby only, and that the measure of that damage was the difference between the value of the guarantied stock of Seymour, Sabin & Co. and the value of the stock of the Minnesota Thresher Company at the time of the exchange. This is undoubtedly the true rule. It restores to the debtor all the loss he sustains, while it does no injustice to the creditor. It is supported by reason and sustained by authority. Vose v. Railroad Co., 50 N. Y. 369, 374, 375; Griggs v. Day (N. Y. App.) 32 N. E. 612; Potter v. Bank, 28 N. Y. 641; Booth v. Powers, 56 N. Y. 22; Thayer v. Manley, 73 N. Y. 305; Bank v. Gordon, 8 N. H. 66; Story, Eq. Jur. § 326; Law v. East India Co., 4 Ves. 824, 833; Payne v. Bank, 6 Smedes & M. 24, 38, 39; Neff's Appeal, 9 Watts & S. 36, 43. Under this rule, an important issue arose over the value of the stock at the time of the exchange. At that time, Seymour, Sabin & Co., the

corporation that issued the stock, and the Northwestern Manufacturing & Car Company, the corporation which guarantied the stock, were insolvent, and all of their property was in the hands of receivers appointed by the state court under chapter 76 of the General Statutes of Minnesota of 1878 (Gen. St. 1894, §§ 5889–5911), to convert their assets into money, distribute it among their creditors, and wind up the corporations. It is evident that there were then two, and only two, methods by which the holder of this stock could obtain anything of value for it. One was to sell it for whatever it would bring in the market. The other was to follow the assets of these corporations in the state court, and to obtain from the receivers the share of their proceeds to which the holder of the stock should become entitled on their distribution. Accordingly, the court below permitted competent witnesses to give to the jury their opinion of the value of this stock at the time of the exchange; and it also allowed the parties to prove the amount of the assets and liabilities of the corporations at different times between the appointment of the receivers, in May, 1884, and the sales of the property of the corporations by direction of the court, in 1887 and 1888, together with the amounts finally realized from those sales. There was certainly no error in this general rule. There is no better or safer criterion to determine the value of stock or of the debt of an insolvent corporation than a comparison of the value of its assets with the amount of its liabilities; and where the assets are sold at public auction, after ample notice, and converted into money under orders of a court, in accordance with the provisions of the statutes under which the corporations exist, the amount realized from their sale is ordinarily very conclusive evidence of their value. The fact that the statutes of a state under which a corporation is organized constitute the charter of the corporation must not be overlooked in considering this question. Chapter 76 of the General Statutes of Minnesota of 1878 (Gen. St. 1894, §§ 5889–5911), which provided for the sequestration of the property of these insolvent corporations and its sale under the orders of the state court, necessarily conditioned the value of the stock and liabilities of these corporations; and we should hesitate long before we should hold that the amount obtained for their property at a public sale in accordance with the law of their existence was no evidence of the value of that property.

Our conclusion is that the general rule adopted by the court below was correct, that proof of the value of the assets and of the amount of the liabilities of these insolvent corporations, and proof of the amount realized from their assets at auction sales made under orders of the court, and the opinions of witnesses as to the value of the stock and the value of the assets, were all competent evidence tending to show the value of this stock and of the liability of these corporations upon it.

We turn now to the specific objections to the introduction of some of this evidence. The exchange of stock was made on February 23, 1885. It is assigned as error that the court below admitted in evidence a certain page of the report of the receiver of Seymour, Sabin & Co. to the district court of the state, which contained a schedule

of the liabilities of that corporation on May 12, 1884, the date when the receiver was appointed. But the condition of this record is such that this assignment cannot be considered. The objections to this page of the receiver's report were that it was incompetent, irrelevant, immaterial, and hearsay, for the reason that the defendant in error proposed to offer a statement of a given fact made by the receiver to the court, and to have that statement stand as proof of the fact against the plaintiff in error (a stranger to the record), but did not propose to offer the report of the receiver as an entirety; in other words, that it offered to prove what the liabilities of the corporation were, but did not offer to prove what its assets were in the opinion of the same man. The court overruled these objections, and the plaintiff in error excepted. But the defendant in error thereupon withdrew the offer, and hence no prejudice resulted to the plaintiff in error from this ruling. After withdrawing this offer, the defendant in error offered in evidence the entire report of the receiver, which stated that the assets of the corporation on May 12, 1884, were $1,147,978.27 and that the liabilities were $1,751,766.19. The only objection the plaintiff in error made to this report was that it was "incompetent, but not on the ground that no foundation was laid"; but he does not seem to have pressed this objection, for no ruling was made upon it, and the report was thereupon read in evidence, and no exception to the action of the court or counsel was taken. Upon this record there is nothing in this objection for us to review. Moreover, if a proper foundation had been laid by the testimony of the receiver that this report was a true statement of the assets and liabilities of the corporation, the report would have undoubtedly been competent evidence of the worthlessness of the stock of that corporation, because it disclosed the fact that it was insolvent, and that its liabilities exceeded its assets by more than $600,000, nine months before the stock was exchanged, and the stock could derive no dividend or value from the property of this corporation unless its assets exceeded its liabilities. Since the plaintiff in error waived the objection that no foundation had been laid for the introduction of the report, it was properly received in evidence.

Another alleged error is that the court admitted in evidence a like report of the receiver of the Northwestern Manufacturing & Car Company, made May 10, 1884, over the objections of the plaintiff in error that it was incompetent, irrelevant, and immaterial. But the plaintiff in error subsequently verified the correctness of this very report by the testimony of the receiver, and offered it in evidence on his own behalf. If there was error in admitting it in the first instance, there was certainly no prejudice on the trial, after the plaintiff in error had himself verified and introduced it; and error without prejudice is no ground for reversal.

On September 27, 1887, all the property of the Northwestern Manufacturing & Car Company was sold at public auction, by the order of the state court which was winding up the corporation, and the sale was afterwards confirmed by that court. Great publicity was given to the sale. Notice of its time, place, and character was given six weeks before the sale by publication in the two leading news-

papers of the city of St. Paul, in the Chicago Tribune, the New York Evening Post, the Boston Journal, and the local newspaper published at the home office of the corporation, at Stillwater, in Minnesota. On September 20, 1888, all the property of Seymour, Sabin & Co. was sold at public auction, by order of the same court, and that sale was subsequently confirmed. Complaint is made that the court below admitted these orders of sale, the reports of these sales made to the court by the officers appointed to conduct them, and the orders confirming them. The objection urged is that these sales were too remote from February 23, 1885, when the stock was exchanged, to be any evidence of the value of that stock at that time. If it were not for the fact already adverted to, that the assets of these corporations were in custodia legis at the time of the exchange of the stock, and that these sales were made by the court in accordance with the provisions of the statutes under which these corporations were organized, this objection might well be sustained. Property that is not in the custody of the law, and property that may, at the option of a party, be taken from its custody, may ordinarily be freely sold by its owner at public or private sale immediately or within a very short period of time. In an action for the conversion of such property, opinions of its value or sales of it at a period remote from the time of its conversion are incompetent evidence of its value. This is the general rule, because the great bulk of property is of this character. It is subject to public or private sale at any time at the option of its owner. But the assets of these corporations were not in this situation when this stock was exchanged. They were in the custody of the court, and no stockholder or creditor could reach or sell any of them without its order. They were subject to an unusual restriction as to their sale or disposition. They could be sold only under the orders of the court, and in accordance with the provisions of the statutes relative to the winding up of the insolvent corporations; and the owners of this stock could obtain nothing from these assets except through the proceeds of such a sale. The actual value of the stock did not then depend upon the value of the assets of these corporations to sell at private sale in the open market at that time, but it depended entirely upon the amounts that could be realized from these assets by the court through the administration of the trust imposed upon it by the statutes. To say that the amounts which the court did realize from this property are no evidence of the amounts which it should or could have realized is to fly in the face of the presumption of sound judgment, wise discretion, and reasonable diligence, raised by the fact that the administration of the affairs of these corporations was conducted, and these sales were made, under the orders of a court of general equity jurisdiction. It was within the discretion of that court to direct a sale of all this property immediately after the receivers were appointed, or to postpone the sales of some of it to times when, in its opinion, larger sums could be realized. That court undoubtedly pursued the course which in its opinion would be most beneficial to the creditors and stockholders of these corporations, and the result was that the sale of the last of these assets was made three years and seven months after the ex-

.change of this stock. But the vital question here was, what were these assets worth on February 23, 1885, to sell under the orders of this court, in whose custody they were, under the provisions of the statutes of Minnesota. The testimony of witnesses familiar with the property and its value was properly offered and admitted to prove this fact. Competent witnesses were properly permitted to testify to their opinion as to the value of the stock at the time of its exchange. Evidence of the amounts which the assets of this corporation actually did sell for was also admitted in evidence; and, after the most patient and careful consideration, we are unable to persuade ourselves that the amount which the property actually brought under the orders of the court was not some evidence of the amount which this property was worth on February 23, 1885, to sell under those orders.

The court below permitted a number of competent witnesses called by the plaintiff in error to testify what the guarantied stock of Seymour, Sabin & Co. was worth in their opinion at the time the bank parted with it, but it refused to allow one witness to give his opinion on this subject on the ground that he had not shown himself competent to do so. This ruling is assigned as error. The witness was the cashier of the First National Bank of Stillwater in 1884 and 1885, and that bank held some special preferred stock of Seymour, Sabin & Co., as collateral to a debt due to it. The car company had kept an account with this bank prior to its failure in May, 1884. The bank held a claim against the car company at the time of its failure, and some of its bills receivable passed through the bank for collection. The witness knew all these facts, and that the car company was in high credit before it was declared insolvent; but he had never examined its assets, and knew nothing of their value except from the statements of the officers of the corporation or of the officers of the court, and nothing of the liabilities of the corporation except that claims to the amount of more than $3,000,000 were made against it. He knew of sales of the stock made before the failure in 1884, but he knew of but one transaction concerning the stock after the receivers took the assets of the corporations into their possession, and that transaction was that the bank held some of it as collateral. There was no evidence that the stock had any market value, that this witness knew of any market value for it, or that he had formed any opinion of its value after the corporations were adjudged insolvent and the receivers were appointed; and in this state of the proof the court below held that he was not competent to enlighten the jury by his opinion of its value in February, 1885. A witness ought not to be permitted to give in evidence his opinion of the value of an article unless it appears that he has an opinion, and that he has had and has used advantages superior to those of the jurymen for acquiring correct information on which to base his opinion. In this instance it did not appear that the witness had acquired any correct information from which to form an opinion, or that he had formed any opinion whatever upon this subject. Moreover, an appellate court ought not to reverse a judgment on account of the ruling of a trial court upon the competency of a witness to testify, unless the

ruling is prejudicial and clearly erroneous, because the bearing and action of the witness on the stand may sometimes properly influence the trial court upon a doubtful question of this character, and these cannot be printed and presented to the appellate court. For these reasons we are satisfied that this case ought not to be reversed on account of this ruling.

It is contended that the plaintiff in error was relieved from all liability on the note in suit, and that the court should have so charged the jury, because he stood in the relation of a surety for the maker of the note, and the defendant in error had permitted its claim against the principal to become barred by the statute of limitations before the trial of this action. The facts on which this claim is based are that the bank filed a claim against the maker of the note and the plaintiff in error in this action several years before the statute of limitations ran against either of them, and caused the summons in the action to be served upon the plaintiff in error, but did not cause it to be served upon the maker of the note at all, and its claim against him became barred by the statute before the trial of the action. There was, however, no evidence of any agreement on the part of the bank to extend the time of payment to the maker, or to forbear or delay the prosecution of its action against him. The statutes of the state of Minnesota provided that an action might be brought against two or more persons for the purpose of compelling one of them to satisfy a debt due to the other for which the plaintiff was a surety. Gen. St. Minn. 1878, c. 66, § 130 (Gen. St. 1894, § 5272). The plaintiff in error could have paid the note at any time before the statute ran in favor of the maker, and could then have enforced repayment by the maker, or he could have maintained an action against the maker under the statute we have cited, without first paying the note. Under this state of facts, the plaintiff in error was not released from his liability on the note by the mere failure of the bank to press its action against the maker. Conceding that the plaintiff in error was an accommodation indorser of the note, and that his relation to the maker after he was charged as an indorser was that of a surety, still this relation imposed no obligation of active diligence upon the bank in the prosecution of its suit against the principal. The surety assumes for himself the liability of his principal. The contract of suretyship is not that the creditor will see that the principal pays the debt or performs the obligation, but that the surety will see that the principal pays or performs. It is true that, if the creditor makes a binding agreement with the principal that he will extend the time of payment or forbear to collect the debt, this will release the surety. But the reason of this rule is that such an agreement ties the hands of both creditor and surety, and deprives the surety of his right to pay the debt at any time and enforce repayment from the principal. Mere forbearance or delay in enforcing the obligation of the principal has no such effect, and hence does not release the surety. 2 Brandt, Sur. § 342; Reid v. Flippen, 47 Ga. 273, 276, 277; Whiting v. Clark, 17 Cal. 407, 411; Hunt v. Bridgham, 2 Pick. 581, 584; Mueller v. Dobschuetz, 89

Ill. 176, 182; Hubbell v. Carpenter, 5 N. Y. 171, 177, 178; Rucker v. Robinson, 38 Mo. 154; Morse v. Huntington, 40 Vt. 488.

There are 43 alleged errors assigned in this record. We have carefully considered each one of them. We have reviewed the most important of them,—those upon which counsel for plaintiff in error appeared to place chief reliance,—and we have stated the reasons why they cannot be sustained. No good purpose would be served by an extended discussion of the alleged errors we have not noticed. It is sufficient to say that no exception was taken to the charge of the court, the evidence was sufficient to warrant the verdict, and the court below, in our opinion, committed no material error in the trial of this case. The judgment below must be affirmed, with costs; and it is so ordered.