IN RE McLURE'S ESTATE.

MAURY ET AL., APPELLANTS, v. GOW, ADMINISTRATOR, RESPONDENT.

(No. 5,930.)

(Submitted May 27, 1926. Decided June 22, 1926.)

[248 Pac. 362.]

*Executors and Administrators—Real Property of Estate—Administrator's Sales—Refusal to Confirm—Appeal Lies—Jurisdiction—Inadequacy of Bids—Evidence—Insufficiency.*

Executors and Administrators—Appeal Lies from Order Refusing to Confirm Administrator's Sale.
1.   Under subdivision 3, section 9731, Revised Codes, 1921, authorizing an appeal from a judgment or order made by the district court sitting in probate "against * * * directing * * * the sale or conveyance of real property," an appeal lies from an order refusing to confirm an administrator's sale of such property.

Same—Refusal to Confirm Administrator's Sale of Real Property—Court must Order Resale.
2.   Where the probate court refuses to confirm an administrator's sale of real property made under its order, it must under section 10225, Revised Codes, order a resale.

Same—Refusal to Confirm Administrator's Sale—Jurisdiction.
3.   While an administrator is not one of the "persons interested in the estate" who may file objections to the confirmation of a sale of the estate under section 10226, Revised Codes, and his recommendation when making return of the sale that the sale be not confirmed may have been insufficient to give the court jurisdiction to make an order refusing to confirm, where the bidders by a petition filed subsequent to the return asked that a hearing be had thereon as they could do under section 10226 as parties most interested in the confirmation, it was vested with jurisdiction to proceed.

Same—When Court may Set Aside Administrator's Sale.
4.   The district court, under section 10225, above, may set aside an administrator's sale of the decedent's real property if it is made to appear that the proceedings were unfair, or that the bid was disproportionate to its value and that, on a resale, a bid exceeding that received by at least ten per cent might be had.

Same—Discretion of Court to Delay Sale of Real Property of Estate—Extent of Discretion.
5.   It is the policy of the law that estates be administered with dispatch, to the end that they shall not be wasted by needless

2.   See 11 R. C. L. 366.
4.   See 11 R. C. L. 369.

[76 Mont. 476.]

expense incident to delay, and while the probate court may have some discretion to delay the sale of estate property to await a favorable market, such discretion should be exercised only after a showing that by a reasonable delay the property may, in the not too distant future, be disposed of to a better advantage, and is exhausted when the court determines the necessity for the sale and orders it sold at a time specified.

Same—Setting Aside Administrator's Sale for Inadequacy of Bid—Extent of Power of Court.

6. If an administrator's sale of real property may, under section 10225 above, be set aside for inadequacy of consideration alone without a showing that on resale a bid exceeding that received by at least ten per cent may be had, the rule can exist only in cases where it is made to appear that the bid made is so grossly inadequate as to raise a presumption of fraud and unfairness in the conduct of the sale.

Same—Sale of Mining Property of Estate—Adequacy of Bid—Evidence.

7. The fact that sales of mining property of an estate were duly noticed and advertised, that they were fairly and legally conducted after ample time had been allowed for securing bidders, and that the bids received were the highest and best made, is some evidence that the bids were not disproportionate to the value of the property.

Same.

8. *Held*, under the above rules (pars. 4–7), that where the property of an estate consisting of mining claims, stock in mining corporations, *etc.*, appraised in the inventory at $600,000, petitioners for its sale, however, claiming that the estate was insolvent and unable to pay their adjudicated claim of $26,000, unpaid claims against the estate amounting to over $250,000, was ordered sold and sold at public auction, after eight months had been allowed for the securing of bidders, to petitioners for $2,000, such bid was not so grossly inadequate as to warrant the presumption of fraud or unfairness, the evidence showing *inter alia* that neither other creditors of the estate nor mining men made any effort to show that a better bid could be secured on a resale. (MR. JUSTICE GALEN, dissenting.)

---

[1]    Appeal and Error, 3 C. J., sec. 29, p. 316, n. 43.    Executors and Administrators, 24 C. J., sec. 1644, p. 658, n. 12, 20.

[2]    Executors and Administrators, 24 C. J., sec. 1538, p. 612, n. 95; sec. 1541, p. 616, n. 54; sec. 1645, p. 659, n. 31.

[3]    Executors and Administrators, 24 C. J., sec. 1632, p. 652, n. 14 New; sec. 1636, p. 652, n. 29.

[4]    Executors and Administrators, 24 C. J., sec. 1657, p. 668, n. 28 New; sec. 1670, p. 673, n. 94.

[5]    Executors and Administrators, 24 C. J., sec. 1579, p. 629, n. 71 New; sec. 1678, p. 678, n. 74, 75 New.

[6]    Executors and Administrators, 24 C. J., sec. 1670, p. 673, n. 93.

[7]    Executors and Administrators, 24 C. J., sec. 1680, p. 679, n. 86 New.

[8]    Executors and Administrators, 24 C. J., sec. 1680, p. 679, n. 86.

6.    See 11 R. C. L. 374.

*Appeal from District Court, Silver Bow County, in the Second Judicial District; George B. Winston, Judge of the Third District, presiding.*

In the Matter of the Estate of Charles D. McLure, deceased: Paul A. Gow, administrator. From an order vacating the administrator's sales, Lowndes Maury and others appeal. Affirmed in part and reversed in part.

*Messrs. Canning & Geagan* and *Mr. Lewis Brown,* for Appellants, submitted a brief; *Mr. Lowndes Maury, pro se,* argued the cause orally.

*Messrs. Walker & Walker,* for Respondent, submitted a brief; *Mr. Thomas J. Walker* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

This is an appeal by bidders at administrator's sales from an order made, on recommendation of the administrator, vacating the sales without directing that another sale, or other sales, be had. The following is a synopsis of the history of the estate up to the time the order appealed from was made:

Charles D. McLure died testate on May 20, 1918, leaving an estate consisting of shares in mining corporations and a large number of patented mining claims. His will was duly admitted to probate on June 18, 1918, whereupon certain heirs named as executors qualified and entered upon the discharge of their duties. They employed Lowndes Maury, of Butte, as their attorney. Inventories were filed appraising properties in several counties; these appraisements totaled in excess of $600,000. Claims against the estate, filed and approved, amounted to more than $150,000, and in addition to these claims many of the properties listed were mortgaged to secure indebtedness in amounts not apparent from the record. Many of the properties owned by the corporations in which stock was

held were likewise mortgaged or bonded to secure debts. The appraisements made placed values upon the properties listed without regard to whether they were mortgaged or not. One of the assets of the estate was a block of stock in the "Cascade Silver Mines & Mills Company," then operating on a large scale on its properties at Neihart, in Cascade county. This stock was appraised at $50,000.

In 1920 a part of this stock was sold for $53,750 and an offer of $240,000 was made for the balance thereof. Had this offer been accepted, the receipts from the sale would have discharged all of the indebtedness of the estate and left a substantial balance on hand. The executors, however, rejected the offer and, after twenty-nine months of service, Maury was discharged without payment in full of his fees. Thereafter the executors were removed by the court, and Paul A. Gow was appointed administrator with the will annexed. The outgoing executors having filed their final account without making provision for the settlement of Maury's claim for attorney's fees, objections were filed by the law firm of Maury & Melzner, and proceedings were had which resulted in a judgment in their favor in excess of $20,000, with direction that the judgment be included in a supplemental account. An appeal was taken and the judgment affirmed. (*In re McLure's Estate,* 68 Mont. 556, 220 Pac. 527.)

For four years the administrator had endeavored to dispose of the property of the estate by private sale without success; no other property was ever sold and no income derived from the estate property. The administrator became involved in litigation with the Cascade Silver Mines & Mills Company (*Gow* v. *Cascade Silver Mines & Mills Co.,* 66 Mont. 488, 213 Pac. 1092); operations were thereafter discontinued by the company on its Neihart property; shafts filled with water and tunnels caved; and finally the mill was destroyed by fire.

None of the debts of the estate having been paid and costs of administration having accumulated, on March 27, 1924, the holders of the Maury & Melzner claim petitioned the court for an order of sale of all property of the estate in satisfaction of

its debts. This petition set forth that the claim of petitioners then amounted to more than $26,000; that the principal on unpaid approved claims against the estate amounted to $169,874 on which interest was unpaid to the extent of $69,449.60; and that in addition thereto fees were owing to the administrator, delinquent taxes had accumulated, the administrator had not paid for a stenographer's transcript furnished in 1922 at a cost of $506, and that the present attorneys for the estate or administrator had a claim for an unestimated amount, which, on the hearing hereafter referred to, was shown to be $16,500. The petition alleged that the estate was insolvent and steadily growing more so and estimated the value of the property of the estate at $150,000.

Seven months after the petition was filed, the court made an order directing the sale of the property of the estate at public auction, after notice and within six months from date, but later postponed to July 1, 1925, on which date, and after due publication of notice in accordance with the provisions of the statute in each of the counties in which property of the estate was situated, sales were conducted in the said several counties.

For the purpose of bidding upon the property, Maury associated himself with one James E. Murray and as to all of the property so offered for sale, with the exception of the "Hope Hill" group in Granite county, became the highest and best bidder therefor, either in his own name or in the name of one Stevenson, as trustee for Maury and Murray. The Hope Hill group was bid in by one James Patten, who did not join in the appeal and does not appear to have been in any manner connected with the appellants. Appellants' bids aggregate approximately $2,000.

The administrator made due return of these sales to the court, but therein represented to the court that the bids were wholly disproportionate to the value of the property sold, and prayed that the sales be not confirmed. Thereafter the bidders, with the exception of Patten, filed their petition praying

[76 Mont. 476.]

that the sales be confirmed. No objections to confirmation were filed by parties interested in the estate. The only request for a hearing on the return was contained in the petition of the bidders for confirmation, on which the court duly noticed the hearing. This hearing lasted, with continuances, for three months, and on December 15, 1925, the court made the order appealed from, in which order the court declared that the sales were "fairly and legally conducted," but that, with the exception of a $10 bid upon one claim on which foreclosure had been had and the period of redemption had expired, all sums bid were disproportionate to the value of the property, and thereupon, as heretofore stated, refused confirmation without reference to a resale.

On the hearing, Lowndes Maury, appearing for himself and his cobidders, explained the condition of the several properties of the estate, both physically and with reference to liens thereon, and in argument contended that by reason of the fact that the bidders would have to discharge prior liens upon the properties, and, as all of the properties were abandoned so far as mining operations were concerned, such bids were equal to or in excess of the value of the properties. Referring to the stock in the Cascade Silver Mines & Mills Company, mentioned above, the witness detailed the financial condition of the company and the physical condition of its property and explained that the stock had been listed on the Boston Curb for years, where "wash sales" were put through each month in order to keep it there, and that the stock "has not only no market value but no intrinsic value," but that, with the expenditure of $100,000, it might again be made valuable; that the bid of $250 was not disproportionate to the value of the property, "except that it is in excess thereof."

Referring to a group of claims known as the "Combination group," Maury testified that the group is mortgaged for approximately $2,500; that it is six miles from a railroad; that at one time he bid the property in for $30,000, but that since that time "the second-class ore dump had been removed; the machinery has been removed; * * * the tailings dump that

was supposed to be valuable has not been completely worked because it was abandoned and found to be of no value"; that the bid of $500 is the fair and reasonable value, and "nobody else, I think, will give any more."

A second group, known as the "Henderson group" and also as the "Pan-Metallic" property, which was bid in both as to claims owned and stock in the Pan-Metallic Company, for $400, is the property on which foreclosure was had in December, 1923. The witness testified that legal and equitable liens against the property amounted to approximately the value thereof, and that—"it is a question whether it is owned by the estate as land or owned by the corporation and the stock owned by the estate, or owned by the corporation and somebody else owns the stock."

As to four lots with a dilapidated building thereon in Neihart, bid in for $200, the witness testified that since the closing of the mines at that place some years ago, the best residence in the town could be bought for $500 and no property there could be sold.

Stock in the Lillian Mining Company, in Madison county, was bid in for $150. The property of the corporation has been sold for taxes, and the purchaser was about to secure deed therefor at the time of the hearing; however, during the hearing the company paid the amount of the lien to the treasurer of Madison county. It does not appear from the record that this redemption added materially to the value of the stock sold.

Stock in the Ingersoll Mining Company, the witness stated, has no value, though a bid of $20 was made upon it; the company owns considerable ground and has in years past spent much money, but never produced anything.

The witness made similar explanations concerning other properties on which bids were made, and testified that during the period of notice of sale he made efforts to interest prospective bidders in the various properties, and that, although mining men acquainted with the properties attended the sales and certain of the creditors of the estate were likewise familiar with them and could have protected their claims by bidding, had

they deemed the properties of any value in excess of the bids made, none of these parties would bid at the sales.

W. L. Creden, a mining engineer of experience, testified that six years prior to the sales he made an examination of the Combination group for prospective purchasers; that he found the ore milling ore, the veins spotted with no apparent continuity of ore shoots; that the property was seven miles from a railroad and that hauling that distance would cost $3 per ton; that there would be no net value to the ore even with silver at one dollar whereas the price thereof had fallen to sixty-five cents. This witness testified that the group had no market value.

One Norberg testified that the machinery on the Henderson group had a value of approximately $2,000.

Opposing confirmation, Gow, the administrator, testified that he was a mining engineer of experience; that he had bought and sold mining property in the Butte district; that he had endeavored to sell the properties of the estate for four years, without success. He testified that the stock owned by the estate in the Cascade Silver Mines & Mills Company constituted twenty-eight per cent of the stock of the company; that it was appraised at $50,498.60; and that, while the property of the company has been "inactive" for a number of years, he believed that the appraisement was "in line with the value" of the property. He stated that the company had a bonded indebtedness of $33,000 and "some other indebtedness." He testified that he thought the bid of $250 "ridiculous" considering the value of the property. Referring next to the "Pan-Metallic stock," the witness stated that this stock was appraised at $150,000, and, as there was a vast quantity of ore in the property, he considered the stock worth the appraised valuation or more. The witness gave his opinion as to the amount of ore in and tailings on the "Combination group" and the values therein. He stated that this property was appraised at $250,000 by competent men, and that he considered the appraisal a reasonable valuation on the property.

The appraisal of $7,500 on the Hidden Treasure group was said by the witness to be a "reasonable speculative value," while the bid therefor was but $50. As to certain properties the witness contented himself with giving merely the appraised valuation and the amount of the bid made. Gow testified that the total appraisement was $714,491.40 and the bids totaled "something under $2,000." On cross-examination Gow admitted that he had been unable to secure any offers or bids on the property; that all of the properties were inactive; that there was no income therefrom; and that the indebtedness of the estate amounted to approximately $250,000. The witness stated that he objected to making sales in the manner prescribed "because mining properties can never be sold in that manner and get the money that it is worth." He explained that the fact that properties had never been operated except at a loss made no difference in his estimation of their value, as "there may be a lot of losses before there is a profit," and stated that "the operation of this estate at a loss makes no difference ultimately if it is handled right." Asked, "How long do you believe you can prevent creditors from asserting their rights against it?" he replied, "Outside of Mr. Maury, indefinitely."

William R. McLure, one of the heirs and deposed executors, placed the "market value" of the properties at approximately the appraised valuation, but, on cross-examination, explained that "my knowledge of the amount of ore there is in the property, and what that ore will bring, that is my value of the property, that is my idea of market value. * * * "

A. V. Corry, a mining engineer of experience, testified that he examined the Henderson group in 1923, and placed a value of $150,000 upon the property; this valuation was based upon the amount of ore computed to be in the veins, valued at $9.50 gross, less cost of extraction and concentration. On cross-examination he stated that it would cost approximately $150,000 to place a mill upon the premises, but that $1.50 per ton would take care of the operation of the mill and pay for it by the

time it was worn out. He figured a net profit of $2 per ton on a basis of a hundred tons per day extraction and treatment, but did not mention the distance from the railroad or cost of transportation. This witness made a like computation concerning the Lillian group, owned by the company heretofore mentioned in which the estate owned stock, and fixed the cost of a mill for that property at $150,000, and then placed a value of $75,000 on the property.

The administrator testified that he had redeemed the Pan-Metallic property, without giving details other than that an attorney other than the attorneys for the administrator appeared in the matter and now claims a fee of $1,500 for services in this connection, and then explained that the original debt was refunded and remains as a lien upon the property— in what amount we are not advised.

1. The administrator has moved to dismiss the appeal upon [1] the ground that "the judgment and order attempted to be appealed from is not an appealable judgment or order from which an appeal lies or may be taken under section 9731 of the Revised Codes of 1921." In support of the motion, counsel assert that "an appeal is authorized by statute only, and unless the subject-matter of an appeal falls fairly within the statute the appeal does not lie." With the correctness of this assertion there is, and can be, no dispute. (*Tuohy's Estate,* 23 Mont. 305, 58 Pac. 722.)

Section 9731 consists of three subdivisions, in which are enumerated all judgments, decrees and orders from which an appeal may be taken. Subdivision 3 authorizes an appeal from certain judgments or orders in probate proceedings, one of which is "a judgment or order  *  *  *  against or in favor of directing the partition, sale, or conveyance of real property.  *  *  *  " This appeal is taken from an "order and judgment  *  *  *  refusing to confirm the sales of property.  *  *  *  "

Neither the order of sale, the offering for sale in the manner prescribed in the order, nor the bidding in of the property at

such sale, effects a "sale or conveyance of real property." It is the order of confirmation which finally operates to divest the heirs of their title and to secure to the proposing purchaser the property thus "sold." (*Plains Land & Improvement Co. v. Lynch,* 38 Mont. 271, 129 Am. St. Rep. 645, 99 Pac. 847.) The formal conveyance follows and must recite the "orders of the court authorizing and confirming the sale of the property of the estate and directing conveyance thereof to be executed." (Sec. 10228, Rev. Codes 1921.)

The hearing on the return of the sale is, therefore, for the purpose of determining whether the court will direct or refuse to direct a sale of the property and formal conveyance thereof. If the court's findings are favorable, the court will direct the sale or conveyance of the property; if, on the other hand, the court's findings are unfavorable, it will merely refuse to confirm the sales as tentatively made without, of course, directing that no sale or conveyance be made, as such an order would be superfluous. The order of the court refusing to confirm is therefore "a judgment or order * * * against the * * * sale or conveyance * * * " of the property.

This question has never been before this court, but it has been determined in conformity with the above views in other states having statutes, authorizing appeals, similar to our section 9731 above. (*In re Leonis' Estate,* 138 Cal. 194, 71 Pac. 171; *In re Bradley's Estate,* 168 Cal. 655, 144 Pac. 136; *In re McVay's Estate,* 14 Idaho, 64, 93 Pac. 31; *In re Christensen's Estate,* 15 Idaho, 692, 99 Pac. 829; *In re Bohanan,* 37 Okl. 560, 133 Pac. 44; *In re Auerbach's Estate,* 23 Utah, 529, 65 Pac. 488.)

The order appealed from is an appealable order, and the motion to dismiss is therefore overruled.

2. It is first urged by the bidders that the order appealed [2] from is erroneous in that, having vacated the sale as made, the court failed to order a new sale under the original order of sale.

Under the provisions of Part IV, Chapter 43, Revised Codes of 1921, an administrator may, when the sale of the property of an estate is necessary in order to pay the outstanding debts of the decedent or the debts, charges, and expenses of administration, sell the real estate as well as the personal property "upon the order of the court or judge" (sec. 10210); to obtain such order he must file his verified petition therefor (sec. 10211); and if the administrator neglects to apply for such an order, "any person in interest" may make the application (sec. 10219). These proceedings "are in the nature of an action, of which the presentation of the petition is the commencement and the order of sale is the judgment. (*Spriggs' Estate*, 20 Cal. 121.)" (*Broadwater* v. *Richards*, 4 Mont. 80, 2 Pac. 546.) In the case at bar no appeal was taken from the order of sale, and it stands as a final judgment which cannot be attacked collaterally or set aside by the trial court. Pursuing the analogy further, the sale under the order is analogous to a sale of the judgment debtor's property on execution or foreclosure sale, and a failure of consummation of the sale wipes out only the sale and does not affect the original judgment or order of sale; it still stands as the order of the court and must be obeyed.

Section 10225 of the above Chapter provides that if, on the hearing on the return of sale, the court finds against the sale, "the court or judge may vacate the sale and direct another to be had. * * * " It is clear from the nature of the order of sale and from the wording of this section that when the facts presented warrant the vacating of the sale made, the court cannot merely refuse confirmation and leave the petitioning administrator or "persons in interest" without redress other than to commence a new "action" by the filing of a second petition for an order of sale. The court therefore erred in failing to direct "another sale," but if the order is otherwise sustainable this error might be corrected by direction without reversing the judgment and order appealed from.

3. It is next contended that the court had no jurisdiction
[3] to refuse confirmation, as no "interested person" had
filed objections.

It is true that section 10226, Revised Codes 1921, gives
the right to file written objections to confirmation only to
"persons interested in the estate," and that the adminis-
trator is not such a person as is contemplated by the statute;
he is but an officer of the court charged with certain duties,
and stands in much the same position with reference to the
matter as does a sheriff in whose hands has been placed an
execution or order of sale in foreclosure proceedings. How-
ever, section 10225 above provides that "a hearing upon the
return of the proceedings may be asked for in the return
or by petition subsequently, * * * " and that "upon the
hearing, the court or judge must examine the return and
witnesses in relation to the same, * * * " and on find-
ing certain facts "may vacate the sale and direct another
to be had," while section 10226 provides that, when written
objections are filed by a person interested in the estate, such
"objections * * * may be heard * * * when the re-
turn is heard. * * * " It is therefore apparent that a
hearing may be had upon the return and action taken by the
court in the absence of written objections by an interested party,
either when asked for in the return or "by petition subse-
quently." The statute does not declare by whom such subse-
quent petition may be filed. Here, while the administrator did
not ask for a hearing in his return, he prayed that the sales
made to these bidders be not confirmed for the reason that the
bids made were wholly disproportionate to the value of the
property sold, and thereafter the bidders, being the parties most
interested in the confirmation of the sales, "by petition subse-
quently" asked that a hearing be had on the return; this, in
our opinion, they had the right to do under the statute above
quoted, and their action in doing so vested the court with juris-
diction to make the order appealed from, even though the

prayer of the administrator may not have been sufficient to do so.

4. Finally, it is contended that the order should not be [4] sustained for the reason that the court erred in finding that the bids were disproportionate to the values of the several properties, and for the further reason that no offer of ten per cent in excess of the bids was made and no showing was made that, on a resale, bids exceeding those received by at least ten per cent, exclusive of the expenses of such resale, might be had.

Again reverting to section 10225, we find that the court is permitted to vacate sales on which return is made and direct another sale to be had "if the proceedings were unfair, or the sum bid disproportionate to the value, and if it appears that a sum exceeding such bid at least ten per cent, exclusive of the expenses of a new sale, may be obtained, * * * " and, where the findings are the reverse of those indicated, the court must confirm the sale. (Sec. 10227.) The intention of the legislature is clear. The authority of the court to vacate a sale is dependent upon fact conditions found in conformity with the three clauses quoted, the first and second of which are in the disjunctive and the second and third in the conjunctive. The court must find either that the proceedings were unfair, *or* that the bid was disproportionate to the value, and that on a new sale an advance bid may be obtained. Here the court found that the sales were fairly and legally conducted, but that the bids were disproportionate to the value, and made no finding regarding an advance bid, while it is clearly inferable from the record that no such bid could be obtained until such time as conditions affecting the mining industry have materially changed.

Has the administrator of an estate, or the court sitting in [5] probate, power or authority to postpone the sale of estate property, the sale of which has been declared neces-

sary to discharge the debts of the estate, to await such a contingency?

While the interest of the estate is paramount (*State ex. rel. King* v. *District Court,* 42 Mont. 182, 111 Pac. 717), it is the policy of the law that estates be administered with dispatch, to the end that they shall not be wasted by needless expense incident to delay. (*In re Dolenty's Estate,* 53 Mont. 33, 161 Pac. 524.) "Mismanagement of the estates of the dead, and the long delays which too often are permitted in the settlement thereof, often come very near spoliation. The courts are charged with the solemn duty of seeing that there shall not be any spoliation either with ill or good intent. (Mr. Justice Milburn, in *State ex rel. Eakins* v. *District Court,* 34 Mont. 232, 85 Pac. 1024.)" (*In re Jennings' Estate,* 74 Mont. 449, 241 Pac. 648.)

The prevention of the enforcement of creditors' claims "indefinitely" as suggested by the administrator, for any purpose, and particularly on a chance of a revival of the mining industry, is not sanctioned by our laws. While the court may have some discretion to delay the sale of the property of the estate to await a favorable market (see *Nelson* v. *First Nat. Bank,* 69 Fed. 798, 16 C. C. A. 425), such discretion should be exercised only after a showing that by a reasonable delay the property may, in the not too distant future, be disposed of to a better advantage, and, under our law, such discretion is exhausted when the court determines the necessity for the sale and orders it to be held at a time fixed in the order. As heretofore stated such an order is a final judgment, and, in the absence of an appeal therefrom, no method is provided by law for its recall or revocation; no course is left open to the administrator other than to comply with the order or obtain such extensions of time as the court may be willing to grant. In the order made the court was liberal in fixing the original date and in extending the time for the sale.

If an administrator or a party interested in an estate be not satisfied with the bids received, attack on the sale can be made in the manner prescribed in sections 10225 and 10226, above, and, on a hearing on return of sale it is incumbent upon the one attacking the sale if he would succeed in having the sale vacated, to come into court prepared to show that the sale was tainted with fraud or was not fairly conducted or to show by competent legal evidence that the bids were disproportionate to the value of the property, and that on a resale bids exceeding the bids made by at least ten per cent, exclusive of the expense of a new sale, may be obtained, or to present to the court an offer in writing made by a responsible party and at least ten per cent in advance of the bid made, for it is only on a finding of one or the other of those alternatives that the court is authorized to vacate the sale, and then only for the purpose of ordering a new sale.

It is urged that sales may be set aside for inadequacy of [6] consideration alone, and that upon this ground the order of the trial court should be upheld. Such a rule is suggested in the *King Case* with reference to sale of personal property, and may exist also as to real property sales, but can exist only in cases wherein it appears that the bid is so grossly inadequate as to raise a presumption of fraud and unfairness in the conduct of the sale. (See *Dunn* v. *Dunn,* 137 Cal. 51, 69 Pac. 847; *McGregor* v. *Jensen,* 18 Idaho, 320, 109 Pac. 729; Woerner on American Law of Administration 478.) [7] Here it must be remembered that the property sold was either mining claims or property depending for its value upon mining operations; this class of property differs materially from staple articles of trade or agricultural lands and city lots; it has little stability of value and such a violent depreciation therein as is indicated by the testimony before us does not necessarily prove that the bids made were grossly disproportionate to the actual value of the property sold.

That mining claims, even though patented and whether merely prospects or mines from which large amounts of low grade ore have been taken, have at a given time a market value running into the hundreds of thousands of dollars and are known to still contain immense bodies of low grade ore, and within a few years or a few months become practically valueless, or that town property, on the closing down of the mines which gave birth to the town, likewise becomes of less value than the cost of the material used in the erection of buildings thereon is not unique to the property of the McLure estate. Such condition is referred to in *Mantle* v. *Speculator Co.*, 27 Mont. 473, 71 Pac. 665; they are a part of the tragic history of the mining industry in this and sister states. Throughout the West, abandoned mines, deserted mills, "ghost cities," abound—sad monuments to the blasted hopes and conclusions of practical mining men who could determine the amount and value of ores in the ground and figure a handsome profit for its extraction on paper, but could not realize that profit from the reduction of the ore. This condition is not unknown even in the immediate vicinity of Butte and within the "Butte district," the greatest mining district on earth.

The fact that sales were duly noticed and advertised, and that the sales were fairly and legally conducted after ample time allowed for the securing of bidders, and that the bids received were the highest and best bids made, is some evidence that those bids were not disproportionate to the "value" of the properties on such sales. (See *Nelson* v. *First Nat. Bank,* above.)

Again, in determining whether these bids were dispropor-
[8] tionate to the value of the properties sold, we must take into consideration the fact that the administrator, the heirs, and other creditors of the estate had more than eight months between the entry of the order and the time of sale in which to secure the attendance of mining men at the sales,

and in this they were abetted by the petitioning creditors, and approximatetly six weeks between the times of the sales and the beginning of the hearing on return thereof in which to secure written offers by responsible parties in excess of the bids, or proof that, on a resale, bids complying with the provisions of the statute might be obtained. The showing and the admissions that neither mining men familiar with the properties nor creditors who might be expected to protect their claims against sales below the value of the properties sold for the satisfaction of those claims, would make a bid upon the properties at the sales nor make an offer in writing at least ten per cent in advance of the bids, nor come into court to testify that on a resale advance bids might be obtained, is persuasive to the conclusion that the bids made were not disproportionate to the value of the properties, even though those properties do contain large deposits of ore of the grade mentioned, which *might* after the expenditure of large sums of money be extracted and reduced at a profit.

The testimony on the whole does not show so gross inadequacy in the bids as to warrant a presumption of fraud or unfairness, and the trial court did not so find, but, on the contrary, found that the sales were legally conducted and fairly made, and on this finding, coupled with the admission that an advance bid could not be had on a resale, the order appealed from was clearly erroneous. However, as the bidder James Patten did not join in the appeal, the order cannot be reversed as to the sale made to him.

For the reasons stated the order is affirmed as to the bid of James Patten on the Hope Hill group, and as to all other sales mentioned therein and in the return on order of sale, the order is reversed and the cause remanded to the district court of Silver Bow county with direction to confirm said sales.

[76 Mont. 476.]

The opinion herein promulgated June 22, 1926, is withdrawn, and this opinion is substituted in lieu thereof.

*Affirmed.*

Mr. Chief Justice Callaway and Associate Justices Holloway and Stark concur.

Rehearing denied July 17, 1926.

### On Motion for Rehearing.

MR. JUSTICE GALEN.—I am not satisfied with the decision of this appeal and am of opinion a rehearing should have been granted.

It seems to me that the court is constituted the conservator of estates, and that even in the absence of objection made to the confirmation of a sale of estate property, the court with propriety should refuse to order a confirmation where, from facts appearing or within its knowledge, the purchase price is wholly inadequate. Under such circumstances, it would seem to me proper for the court to order a resale, in order to protect an estate from despoliation. The questions involved are so important and far-reaching in effect that I think the motion for a rehearing should have been granted.