# GLOBE INDEMNITY COMPANY *v.* ETTCHEN WELLINGTON REINHART.

*Accident Insurance Policy—Self-inflicted Injury—Burden of Proof—Hearsay Evidence—Hospital Chart.*

A hospital chart, which contained entries made by the chart nurse from information orally given her at the time by the nurse attending the patient, and which the chart nurse testified to be a correct record of such information, was admissible as against an objection that its contents were hearsay, the attendant nurse being, at the time of the trial, out of the state, inaccessible, and beyond the process of the court.

pp. 445, 451

In order that the admissibility of a hospital chart be determinable on appeal, as against an objection that the entries therein were hearsay, as embodying information furnished by one other than the nurse who made the entries, it was not necessary that the chart be included in the record, though this would be necessary in order to determine the materiality or relevancy of its contents, or whether they represented an expression of opinion by persons not competent.      pp. 451, 452

In an action on an accident insurance policy, based on the death of insured by a fall from a hospital window, a medical

expert, who had not seen insured, but had heard the testimony of the hospital physician that insured had been taken into the hospital on the twenty-second of the month, to be treated for acute alcoholism, and that he was "all right" on the twenty-fifth, could not be asked whether, in his opinion, insured was cured of acute alcoholism on the twenty-fifth, such question not being directed to what he could know from his medical knowledge and experience.                    pp. 452, 453

In an action on an accident insurance policy, based on the death of insured by a fall from the window of a hospital, where he had been taken while suffering from acute alcoholism, the exclusion of questions asked a medical expert, as to whether insured would have sustained the injury if he had not been suffering from acute alcoholism, and as to the bearing of that disease upon his injury and death, was not reversible error, in view of his answer to another question, that habits of intoxication would usually defer or prevent a cure of any injury or disease.                    pp. 453, 454

In an action on an accident insurance policy, which does not cover loss for self-inflicted injuries while sane or insane, the beneficiary, in order to recover on account of the death of insured, must allege and show that the death was caused directly and exclusively by bodily injury sustained solely through accidental means.                    p. 455

In such an action, based on the death of insured by a fall from a window, the legal presumption that the fall was accidental, based on the fact that the law does not presume self-inflicted injuries, while sufficient to go to the jury as some evidence in support of plaintiff's case, is not conclusive.    p. 456

In such an action, the fact that evidence is produced, tending to prove that the injury was self-inflicted, does not change the burden upon plaintiff to show by a preponderance of the evidence that the injury was accidental, and at no time does this burden shift so as to justify an instruction that the burden is on defendant to show that the injury was not accidental.

pp. 456-459

*Decided March 4th, 1927.*

Appeal from the Circuit Court for Allegany County (Doub, J.).

Action by Ettchen Wellington Reinhart against the Globe Indemnity Company of New York. From a judgment for plaintiff, defendant appeals. Reversed.

Among the plaintiff's prayers were the following:

*Third*—The jury is instructed that where death results from a fall of the deceased from a second-story window, self-inflicted injury is not to be presumed, but the law presumes the same was the result of accident, unless the jury find from a preponderance of the evidence in the case that the fall was self-inflicted and that it was not the result of accident.

*Fourth*—The jury is instructed that if they find from the evidence that Boyd A. Reinhart was sane on or about noon of the day of his death, then the presumption is that his sanity continued until the time he met with his injury, and the burden is upon the defendant to prove by a preponderance of the evidence that he was not sane during said interval of time.

*Fifth*—The jury are further instructed that if they find from the evidence that Boyd Reinhart either fell accidentally from the window of the hospital or cast himself from the window intentionally while sane or insane, and the minds of the jury are in a state of even balance from the testimony as to which caused his injury, the presumption is that the fall was accidental.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*Charles F. Harley,* with whom were *F. A. W. Ireland, Charles Z. Heskett,* and *Michel James Manley,* on the brief, for the appellant.

*Walter C. Capper* and *F. Brooke Whiting,* for the appellee.

DIGGES, J., delivered the opinion of the Court.

The appellee (plaintiff below) obtained a judgment against the appellant in the Circuit Court for Allegany County, from which judgment this appeal is prosecuted. The cause of action is an accident policy insuring Boyd A. Reinhart, the husband of the appellee. The policy, which is the contract sued on in this case, is as follows:

"GLOBE INDEMNITY COMPANY OF NEW YORK.

"Policy No. XO-103012.   Class No. One.

"Single Indemnity, $ 7,500.00.

"Double Indemnity, $15,000.00.

"Hereby insures the person named in answer 1 of ths schedule of warranties endorsed hereon against loss caused (1) directly and exclusively by bodily injury sustained solely through accidental means, or caused (2) by any physical or mental disease, subject to the terms, provisions and limitations hereinafter contained.

"Section 1.   Accident Indemnity.

"(a) If such injury, within 12 months from date of accident causes the insured to sustain a loss enumerated in this section, the company will pay the sum specified for such loss as follows: Life, $7,500.

"6.   The sum specified for loss of life, and any indemnity that has accrued and may be due when such loss occurs, is payable to the beneficiary named in the schedule of warranties or to such other beneficiary, if surviving, as the insured may hereafter designate, and the company accept by endorsement hereon; otherwise to the insured's administrator or executor. Any other indemnity is payable to the insured.

"11.   This policy does not cover loss caused by any means, injury or disease which, had it been used or self-inflicted by the insured while in possession of all mental faculties, would be deemed intentional.

"In witness whereof, the Globe Indemnity Company of New York has caused this policy to be signed by its president and its secretary, but the same shall not

be binding upon the company until countersigned by a duly authorized representative of the company.

                              "Geo. W. Labor,
"A. Duncan Reid,                              "President.
        "Secretary.

"Countersigned at Cumberland, Maryland, this 13th day of March, 1913.

                    "Boyd A. Reinhart,
                          "Authorized Representative.
"Examined: A. N.

              "Schedule of Warranties.

"1.  My full name is Boyd A. Reinhart.   Color, White.

"14.   I designate as beneficiary Ettchen Wellington Reinhart, Relationship, Wife, of Cumberland, State of Maryland.

              "Globe Indemnity Company.

              "Valuable—Do Not Destroy.

"It is hereby agreed that Policy No. XO-103012, issued to Boyd A. Reinhart is continued in force for twelve months from the 12th day of March, 1925, noon, standard time, subject to the payment of Seventy-five Dollars ($75.00) premium and to all the terms and provisions of said policy.   Not valid until countersigned by a duly authorized representative of the company.

"Countersigned at Newark, N. J., this 12th day of March, 1925, by I. F. Levy.

                    "Boyd A. Reinhart,
                      "Authorized  Representative.
                    "A. Duncan Reid,
                      "President and General
                              "Manager."

The undisputed facts disclosed by the record may be with substantial accuracy thus stated: That Boyd A. Reinhart, about forty-five years of age, after spending about two weeks in the Laurel Sanitarium, on November 22nd, 1925, entered the Allegany Hospital in Cumberland, suffering from alcoholism.   That on November 25th, about noon, he was visited

in his room by Dr. Everhart, his attending physician, and was, in the doctor's belief, clear mentally and fully recovered from his intoxication. That he was seen by the witness William Banks, who was the elevator man at the hospital, about a quarter to seven o'clock on the evening of the same day, standing in the door of his room, in a bathrobe; that about fifteen minutes thereafter he was found lying in the concrete alley, directly beneath the window of the room which he occupied, in a pool of blood, with both femurs fractured, the thigh-bones projecting from the flesh, the left bone badly shattered. That upon being discovered he was taken immediately to the operating room of the hospital, administered anesthetics, and the fractures reduced as far as possible. That after the operation he was taken to his room, suffering from shock and great pain, and according to the testimony of the night nurse, who was with him the nights of the 25th, 26th and 27th, was delirious during the time she was with him. That he died on the morning of the 28th. That the door of his room, in which he was seen standing shortly before seven o'clock, was about six feet from the window; that the distance from the floor to the top of the window sill was two feet ten inches, the width of the window being two feet eight inches; that the wall from the floor to the top of the window sill was practically perpendicular, the window sill sloping from its top outward towards the alley.

There are thirteen exceptions in the record, twelve to rulings on evidence and one to the ruling on the prayers. Disposing of the exceptions to the evidence, we find no error in the rulings on the first, second, fourth and twelfth exceptions, none of which were argued or pressed by the appellant. Those upon which the appellant relies are the third, relating to the admissibility of the hospital chart, and the group of exceptions, from the fifth to the eleventh, inclusive, relating to questions asked the medical expert witness, Dr. Koon. We will dispose of these in the order named.

The third exception arose in the following manner. The

witness Miss McElfish was on the stand, she being the chart nurse of the hospital assigned to the hall upon which the room occupied by Mr. Reinhart was located. It was her duty to make the entries which constituted or made up the chart, which she did from information orally furnished her by the attendant nurse. She testified that she made certain entries upon the chart, covering November 25th, the day of the accident, from information given her by Miss Gardner, the nurse who was in attendance upon Mr. Reinhart during that day; that she correctly and accurately recorded the information so given her; and it appears that Miss Gardner, the attendant nurse on that day, was out of the state, inaccessible and beyond the process of the court, at the time of the trial. It was further shown that the chart nurse made the entries on the day and at the time the information was furnished her by the attendant nurse. This chart is not reproduced in the record, but it is stated in the brief of counsel for the appellant that it was offered for the purpose of showing that at three o'clock on November 25th Mr. Reinhart was delirious. It was testified by the attendant physician, Dr. Everhart, that he saw Mr. Reinhart on that day about twelve o'clock, talked with him for fifteen or twenty minutes, and believed him at that time to be clear mentally and fully recovered from his intoxication. It is therefore apparent that if it could be shown that, although the patient was clear mentally at about twelve o'clock, at three o'clock on the same day he was delirious, it would be a material fact to which the jury would be entitled in determining whether at seven o'clock on the same day, the time of the accident, Mr. Reinhart was or was not in a mentally sound condition. This exception, therefore, presents a direct inquiry, and requires the decision of this court upon the question of the admissibility of the hospital chart, without having as a witness the person who had knowledge of the truth of the facts therein recorded.

The hearsay rule generally prevents a witness from testifying to an entry unless the witness so testifying has per-

sonal knowledge of the truth of the matters recorded. This rule has been frequently enunciated by this Court, the latest expression being contained in the case of *Cohen v. Bogatzky,* 149 Md. 134. In that case the Court, speaking through Judge Offutt, referring to a book of account, said: "The general rule in regard to the admissibility in evidence of such a book is that, before it is admitted or used for any purpose, testimony should be given authenticating it, showing it to be a book of original entries kept for that purpose, that the entries were true and correct and reasonably contemporaneous with the transaction. *Jones on Evidence,* par. 573. And it should appear that the person making the entries had personal knowledge of the facts recorded, or his testimony should be supported by that of some person who did have such knowledge." There are, however, certain exceptions to this rule, based upon the circumstantial guarantee of trustworthiness of the record itself, and upon the inconvenience and well-nigh impossibility of producing witnesses who could from their own personal knowledge testify to the truth of the entries made. Among the reasons for excluding hearsay testimony is the inherent uncertainty of its reliability, and the fact that the person stating the thing to be a fact is not under oath and subject to cross-examination. The purpose of presenting evidence in support of a contention is to establish facts from which reasonable minds form conclusions and render judgments. In a majority of cases these facts are established by testimony of witnesses who have personal knowledge upon the subject, and this testimony is received for the reason that it has the guarantee of reliability.

The question here presented is whether evidence represented by the hospital chart contains a sufficient guarantee of its truthfulness. We are of the opinion that it does. It is a record required by the hospital authorities to be made by one whose duty it is to correctly make the entries therein contained. So far as the hospital is concerned, there could be no more important record than the chart which indicates

the diagnosis, the condition, and treatment of the patients. This record is one of the important advantages incident to hospital treatment, for it not only records for the use of the physician or surgeon what he himself observes during the time he is with the patient, but also records at short intervals the symptoms, condition, and treatment of the patient during the whole time of the physician's absence. Upon this record the physician depends in large measure to indicate and guide him in the treatment of any given case. Long experience has shown that the physician is fully warranted in depending upon the reliability and trustworthiness of such a record. It is difficult to conceive why this record should not be reliable. There is no motive for the person, whose duty it is to make the entries, to do other than record them correctly and accurately. On the other hand, there is the strongest reason why he should: First, because of the great responsibility, he knowing that the treatment of the patient depends largely upon this record, and if it be incorrect it may result, and probably will result, in the patient's failure to receive proper surgical or medical treatment, which failure might be followed by serious consequences or even death. Second, the entrant must realize and appreciate that his position is dependent upon the accuracy with which the record is made. Third, as was stated by Tindall, C. J., in *Poole v. Dicas,* 1 Bing. N. C. 649: "It is easier to state what is true than what is false; the process of invention implies trouble in such a case unnecessarily incurred."

What we have said applies to a case when the person who made the entries on the chart is dead, insane, or inaccessible; and it applies with equal force to the person having personal knowledge of the truth of the entries, and who, at the time when such facts were fresh in his mind, furnished them to the person who recorded them, and who is at the time of the trial inaccessible by reason of death, insanity, or being beyond the jurisdiction of the court. In the present case Miss McElfish made the entries contained in the chart, and to this she testified; and while she had no

personal knowledge of the truth of the facts recorded, they were given to her by Miss Gardner, the nurse attending Mr. Reinhart during the day of November 25th, 1925, practically simultaneously with the acquisition of those facts by Miss Gardner. All of the things which we have said, which would constitute a guarantee that Miss McElfish correctly recorded the facts furnished her by Miss Gardner, apply with equal force to guarantee the truth of the facts so furnished. It was her duty to obtain these facts from which the record was made. They were obtained in the regular course of her employment. They were furnished to the chart nurse practically contemporaneously with her receiving the knowledge. She was cognizant of the necessity for their truth and accuracy, and of the responsibility which rested upon her; and in her case also there was the knowledge that her position depended upon the fidelity and accuracy with which she discharged her duties. It is clear that every reason exists why the hospital authorities and those connected with it should require that records of this character should be correct and accurate. In this day of advancement in medical science and the diagnosis and treatment of disease, hospital staffs include many specialists in different branches of the medical profession; so that it frequently happens that when a patient enters a hospital he is examined by a number of these specialists; a heart specialist will examine him to detect heart trouble, a lung specialist for lung trouble, a throat, eye, and ear specialist for those affections, and so on, to constitute a full and thorough examination of the whole body and all of its organs. It is the rule and practice for these physicians to dictate their findings to stenographers, who in turn convey this information to the person whose duty it is to keep the chart or record of the particular patient's case; and while, as we have said, this chart contains evidence which is as reliable and trustworthy as any evidence upon which men act in the most serious affairs of life, yet if it were necessary, in order to introduce the evidence contained in the chart, that each one of the specialists who examined

the patient, the result of whose examination made up the chart, were required to be present in court and testify to the truth of the particular portion of the chart made as a result of his examination, there would be a practical denial by the courts of the use of such evidence as contained in the charts.    There seems to be no good reason why, the person who made the chart having given evidence of its authenticity, the method by which it was made up, the chart itself should not be admitted as evidence of the truth of the facts therein recorded.

The decisions of the courts are not harmonious on this subject, but the principle which we have adopted finds support in *Fielder v. Collier,* 13 Ga. 499; *Nelson v. First Nat. Bank,* 16 C. C. A. 425, 69 Fed. 805; *Continental Nat. Bank v. First Nat. Bank,* 108 Tenn. 374; *United States v. Cross,* 20 D. C. 379; *Chisholm v. Machine Co.,* 160 Ill. 101; *Donovan v. Boston & Me. R. Co.,* 158 Mass. 450; *Northern Pac. R. Co. v. Keyes,* 91 Fed. 47; *United States v. Venable Construction Co.,* 124 Fed. 267; *Dohmen Co. v. Niagara Fire Ins. Co.,* 96 Wis. 38.    In *Wigmore on Evidence,* vol. 2, sec. 1530, p. 1895, it is said: "Where an entry is made by one person in the regular course of business, recording an oral or written report, made to him by one or more other persons in the regular course of business, of a transaction lying in the personal knowledge of the latter, there is no objection to receiving that entry under the present exception, provided the practical inconvenience of producing on the stand the numerous persons thus concerned would in the particular case outweigh the probable utility of doing so.    Why should not this conclusion be accepted by the courts?    Such entries are dealt with in that way in the most important undertakings of mercantile and industrial life.    They are the ultimate basis of calculation, investment, and general confidence in every business enterprise; nor does the practical impossibility of obtaining constantly and permanently the verification of every employee affect the trust that is given to such

books. It would seem that expedients which the entire commercial world recognizes as safe could be sanctioned, and not discredited, by courts of justice. When it is a mere question of whether provisional confidence can be placed in a certain class of statements, there cannot profitably and sensibly be one rule for the business world and another for the court room."

In the case of *Mt. Vernon Co. v. Teschner,* 108 Md. 158, in dealing with the question of the admissibility of the New York Journal of Commerce as evidence of the market value of a commodity, the Court, speaking through Judge Boyd, after quoting from Judge Miller's opinion in the case of *Munshower v. State,* 55 Md. 24, wherein Gruber's Almanac was admitted in evidence to prove the hour the moon rose, said: "*Cliquot v. United States,* 3 Wall. 114, is a leading case on the general subject. * * * The Supreme Court in passing on the admissibility of the evidence referred to the statement in *Lush v. Druse,* 4 Wend. 313, that 'the proof was by a witness who had inquired of merchants dealing in the article, and examined their books. This, uncontradicted, was sufficient; and the Supreme Court then said: 'With this ruling we are satisfied. While courts, in the administration of the law of evidence, should be careful not to open the door to falsehood, they should be equally careful not to shut out truth. They should not encumber the law with rules that will involve labor and expense to the parties and delay the progress of the remedy—itself a serious evil—without giving any additional safeguard to the interests of justice.' "

In *Hall v. Trimble,* 104 Md. 317, the sixth, seventh and eighth exceptions related to the refusal of the court to admit in evidence three records of the Baltimore City Hospital, or to allow Dr. A. W. Deal to testify as to certain facts connected with the keeping of those records. The purpose of introducing in evidence these entries was to show that Hall had been treated in the hospital on the 14th, 19th, and 25th days of September, 1903. This Court, in affirming the

action of the lower court, said: "It was shown, and not denied, that he had been treated at the city hospital for the injuries complained of. That he was treated on the particular days mentioned does not appear to have been a matter of any consequence and, therefore, the plaintiff had no good reason to complain of the rulings embraced in these exceptions. But had the evidence been material and relevant to the issue, the proper foundation had not been laid for its admission. When the entries were made, or by whom, does not appear. They were supposed to have been made by Dr. Boyles, who was not produced at the trial, whose evidence was not taken under a commission, who is not shown to have been on duty at the hospital on the days mentioned, and that it was not proved that the entries were in his handwriting. Under such circumstances the records were not admissible."

While this case is not directly in point, the clear inference to be deduced from the language there used is that had the proper foundation been laid, the evidence would have been admissible. Circumstances constituting a proper foundation, which the court in that case held were necessary, but were not supplied, are all present in the case at bar.

We are not to be understood as holding that everything in this chart would be proper evidence, but our decision on this point is confined to determining that the objection to the admission of the chart on the ground of its contents being hearsay, is not well taken. The chart being presented, if its contents upon examination would be open to other objections, such as immateriality, irrelevancy, or that it was an expression of opinion by persons not competent to express an opinion, those objections are not precluded by what we have here said. It is evident that any objections to the matter contained in the chart, upon the grounds suggested, could not be passed upon by this Court unless the chart was made a part of the record in the case. *Junkins v. Sullivan,* 110 Md. 539, at page 544. The situation here presented, however, is the question of whether or not the chart should be rejected for the reason that the party mak-

ing the entries had no personal knowledge of the truth of
the entries recorded, and therefore it is alleged these entries
are hearsay, when attempted to be testified to by the chart
nurse.   In such a case it is clearly apparent that the inclu-
sion of the chart in the record, or the knowledge by this
Court of its contents, has nothing to do with the decision of
the question.   The record discloses, and there is no dispute,
that the chart nurse made the entries, as to the truth of
which she had no personal knowledge, from information
given her by Miss Gardner, the attendant nurse, and that
Miss Gardner is beyond the jurisdiction of the trial court.
Under these circumstances, a knowledge of the contents of
the chart would in no way help the court in determining
whether the information given by Miss Gardner to Miss
McElfish, and recorded by her on the chart, is hearsay.   In
other words, the record contains all that is necessary to
enable this Court to determine whether the ruling of the
lower court, in rejecting the chart because of its being hear-
say, was error, and therefore it is not necessary to have the
chart included in the record.·   We might add that if the
chart was included, reference to its contents would not be
necessary to pass upon the question here involved.

During the examination of Dr. Koon, the medical expert,
he was asked:   "Q. You heard the testimony in this case?
A. Yes, sir.   Q. You heard Dr. Everhart's statement that
Boyd Reinhart had been taken into Allegany Hospital on
the twenty-second of November for treatment for acute al-
coholism?   A. Yes, sir.   Q. You heard his statement that
he was all right at noon on the twenty-fifth?   A. Yes, sir.
Q. Can you now state whether or not in your opinion he was
cured of acute alcoholism on the twenty-fifth?"   This latter
question the doctor was not permitted to answer.   This rul-
ing constituted the fifth exception.   The witness had heard
the testimony in the case that Mr. Reinhart entered the hospi-
tal on the 22nd, suffering from acute alcoholism for which
he had to be treated; and further had heard the testimony of
the attending physician that the patient was clear mentally

and fully recovered from his intoxication at noon on November 25th. The question was then put to the expert witness whether in his opinion Reinhart was cured of acute alcoholism on the 25th. It may have been permissible to ask the question whether or not it was possible for a person, under the conditions here described, to be fully cured of alcoholism on that day; this question the doctor might have answered from his expert knowledge, and if he had then stated that no person could have been free from intoxication at the time, under the circumstances detailed, he might then have been asked whether in his opinion Reinhart was free from the effects of the intoxication. But the question here presented was to a witness who had not seen the patient and who was required to assume the truth of all of the testimony, a part of which was to the effect, by the attendant physician, that the patient had fully recovered at noon. The question was not directed to what the witness would know from his medical knowledge and experience as to what would be the likely condition of a patient under such circumstances, but what in his opinion was the condition of this patient. We find no error in this ruling.

The sixth, seventh, eighth, ninth, tenth, and eleventh exceptions were to the sustaining of objections to the following questions asked this witness: "Q. Doctor, can you state whether or not in your opinion Boyd Reinhart would have sustained this injury—the fractured legs—if he had not been suffering at the time from acute alcoholism? Q. What, in your opinion, was the connection, if any, between the disease of alcoholism and the injuries which he sustained from going out the window of the Allegany Hospital? Q. Can you state whether or not alcoholism contributed in any way to the injuries sustained by Boyd Reinhart? Q. In your opinion did alcoholism contribute in any way to the death of Boyd Reinhart and if so, to what extent? Q. In cases such as the one testified to here, what in your opinion, if any, is the effect of alcoholism suffered within three or four days prior—five or six days, prior to the death? Q. What, doctor, in your opinion, would be the effect, if any, on the death of a patient who

died three days after injuries such as were sustained in this case, where it appeared that three days before the injuries the patient had been suffering from acute alcoholism? During the progress of the trial, and after objection to some of these questions had been sustained, the witness was asked this question: "Q. Doctor, if one has been up to the time of his death addicted for a long time to the excessive use of alcohol, and he sustains injuries such as have been described in this case, what effect in your opinion, if any, does that excessive use of alcohol have upon the injured person?" Which question, over the objection of the plaintiff, the court allowed the witness to answer, as follows: "We always know that any alcoholic patient is very much weakened by the condition of being an addict to the habit, and any injury or any disease in an alcoholic subject we always expect less satisfactory results than we do in persons who not have been addicted. That is, any injury to a patient who is suffering from alcoholism, the alcoholism plays a very important part in the chances of that patient getting well. In fact we don't expect them to get well as readily as one who has not been addicted to the habit." From this question and answer it will be seen that the jury was given the benefit of the doctor's opinion upon the general proposition, which contained practically the information sought to be elicited by the questions set forth above, which the witness was not permitted to answer, and was all that defendant was entitled to have. We therefore find no reversible error in these rulings.

The remaining exception relates to the ruling on the prayers. It must be borne in mind that the suit was brought on an accident policy, in which the contract is essentially different from that of an ordinary life insurance contract, and is governed by different principles. By the policy, which is the contract between the parties, the insurance company agreed to pay the legal representatives of Boyd A. Reinhart $7,500 in case of his death caused "directly and exclusively by bodily injury, sustained solely through accidental means." The contract further provides: "This policy does not cover loss caused by any means, injury or disease

which, had it been used or self-inflicted by the insured while
in possession of all mental faculties, would be deemed inten-
tional." While the last above quoted clause is somewhat
unusual in its phraseology, and we have been unable to find
a decided case in which this exact language occurs, it will be
seen by an analysis of its provisions that it in substance and
effect is equivalent to a provision that the policy does not
cover loss for self-inflicted injuries while sane or insane.
The important distinction between this form of accident
policy and a life insurance policy, which contains the pro-
viso that the company will not be liable in case of suicide,
is that in the latter the proviso creates an exception to liabil-
ity on the part of the insured, and therefore is a matter of
defense, which places upon the insured the burden of prov-
ing the exception, that is to say, proving suicide; while in the
former, or accident policy, the beneficiary, in order to bring
it within the terms of the contract, must show not only death,
but death caused directly and exclusively by bodily injury
sustained solely through accidental means. In other words,
as it is incumbent, in life insurance policies, on the benefi-
ciary to prove death, which is the one occurrence which
brings the case within the terms of the policy, so here it is
incumbent upon the beneficiary to show not only death, but
death caused solely by accidental means, in order to present
a case without further testimony, which would render the
insurance company liable on this form of contract. The
necessary allegation of the declaration is that the insurance
company agreed by its contract to pay the beneficiary of the
insured $7,500 in the event of his death being caused directly
and exclusively by bodily injury sustained solely through
accidental means. This necessary allegation is contained in
the present declaration. It is incumbent upon the plaintiff
not only to make this allegation, but to support it by suffi-
cient proof, in order to make out a *prima facie* case. The
effect of this requirement in the present case is that the plain-
tiff offer proof, not only of the death of the insured, but
that it was caused by bodily injury sustained accidentally.

The record discloses proof of death from bodily injury caused by a fall from a second-story window of the hospital, which fall may have resulted either from an accident or from the intentional act of the insured, it being immaterial whether the act was done while sane or insane. In such a case the well-settled legal presumption is that the fall was caused by accident, for the reason that the law does not presume self-inflicted injuries. While the plaintiff is entitled to this evidentiary presumption, it is not conclusive, and is only equivalent to some evidence sufficient to go to the jury in support of the allegations of his declaration. The plaintiff occupying this position, if evidence is produced, proper for the jury's consideration, which tends to prove that the injury was self-inflicted, either while sane or insane, the burden is still upon the plaintiff to show by a preponderance of the evidence that the injury was accidental; and it is error to instruct the jury that in such a situation the burden is upon the defendant to show by a preponderance of the evidence that the injury was not accidental. To state the proposition in another way, the burden upon the plaintiff was the same as before any evidence was offered. The plaintiff asserted the affirmative proposition that the death was caused solely by accident, and it was incumbent upon her to substantiate this affirmation by proof, and maintain the affirmative throughout the case. At no time did this burden shift so as to require the defendant to show by a preponderance of the evidence the negative proposition that death was not caused solely by an accident.

In the case of *Fidelity & Casualty Company v. Weise,* 182 Ill. 496, in considering a suit on an accident policy, the court said: "The plaintiff was entitled to the benefit of the presumption the assured did not take his own life. The presumption was not conclusive, but rebuttable. The question to be determined by the jury, from the consideration of all the evidence (the plaintiff being given the benefit of the presumption referred to), was, at the close of the testimony as it was at the beginning, did the assured come to his death

through accidental means? The appellee asserted the affirmative of this proposition, and it was indispensable to her right to recover under her declaration her position should be supported by a preponderance of the evidence. 1 *Greenleaf on Evidence* (15th Ed.), sec. 74, note (a). The instruction incorrectly cast the *onus probandi* upon the appellant. The case, upon the facts, demanded the jury should have been accurately advised as to the *quantum* of evidence required to be produced by the plaintiff. The error is therefore reversible in character." The general principle is found stated in 1 *C. J.* 496, sec. 284: "In an action upon a policy of accident insurance the burden rests upon the plaintiff, in the first instance, to make out a *prima facie* case in favor of a recovery by showing that the death of or injury to the insured was the result of external, violent, and accidental means as required by the policy; and the introduction of the defense of suicide does not shift the burden, although the presumption in favor of sanity is, in the absence of countervailing proof, sufficient in itself to establish *prima facie* that death occurred otherwise than by self-destruction." To the same effect see *Bernick v. Illinois Commercial Men's Assn.*, 175 Ill. App. 511; *Taylor v. Pac. Mut. Life. Ins. Co.*, 110 Ia. 621; *Laessig v. Travellers' Protective Assn.*, 169 Mo. 272; *Whitlatch v. Fid. & Cas. Co.*, 149 N. Y. 45; *Hill v. Central Accident Ins. Co.*, 209 Pa. 632; *Powers v. Iowa State Travelling Men's Assn.*, 241 Fed. 278; *Lamport v. Aetna Life Ins. Co.* (Mo.), 199 S. W. 1020; *Merrett v. Preferred Masonic Mutual Accident Assn.*, 98 Mich. 338.

In the case of *Weil v. Globe Indemnity Co.*, 179 App. Div. 166, 166 N. Y. Supp. 225, the court, in speaking of an instruction similar to those granted here, said: "This was tantamount to instructing the jury that, if the evidence was evenly balanced, the law resolved it in favor of the plaintiff. This squarely put upon the defendant the burden of producing a preponderance of evidence and was directly contrary to the charge that the burden of proof on the whole case was on the plaintiff. As was said in *Whitlatch v. Fid.*

*& Cas. Co.,* 149 N. Y. 45, where the issue is so close, it is
extremely important to have the rules as to the burden of
proof correctly given to the jury. These contrary instruc-
tions were confusing to say the least and could only have
been understood by the jury as meaning that if upon all the
evidence they were in doubt, or if the scales hung evenly
balanced, the law presumed the issue in favor of the plain-
tiff." In the case of *Whitlatch v. Fid. & Cas. Co., supra,* it
was decided that a charge was erroneous which refused to in-
struct the jury that if, upon the whole case, they find the
evidence to be evenly balanced upon the question as to
whether the insured intended to kill himself, they must find
for the defendant. And the court quoted from *Farmers'*
*Loan and Trust Co. v. Siefke,* 144 N. Y. 354, as follows:
"There is confusion sometimes in treating of the burden of
proof, arising out of unexact definitions. The burden is
upon a plaintiff to establish his cause of action when it is in
proper form denied by the other party. * * * It is very com-
mon to say in such cases that the burden is upon the defend-
ant to establish the fact relied upon. All that this can prop-
erly mean is that when the plaintiff has established a *prima*
*facie* case the defendant is bound to controvert it by evi-
dence, otherwise he will be cast in judgment. When such
evidence is given and the case upon the whole evidence, that
for and that against the fact asserted by the plaintiff, is
submitted to court or jury, then the question of the burden
of proof as to any fact, in its proper sense, arises and rests
upon the party upon whom it was at the outset, and is not
shifted by the course of the trial, and the jury may be prop-
erly instructed that all material issues tendered by the plain-
tiff must be established by him by a preponderance of evi-
dence." In the case of *Lamport v. Aetna Life Ins. Co.,*
*supra,* it was said: "In such a case as this, the burden of proof
does not shift, because under the very terms of the policy
itself the test of defendant's liability to pay the assured was
not the bare fact of the loss of a hand, but the loss of such
hand by accident. Plaintiffs having alleged such loss in

such manner, the burden was cast on them to prove it. During the trial that condition, which is sometimes conveniently called the burden of the evidence, may alternately shift from plaintiff to defendant as the evidence for and against the respective contentions of the plaintiff and defendant is presented, but in a case like this the burden of proof—that is, the duty to persuade or convince the triers of fact that the plaintiff, upon the issues in the case, and the facts in evidence, is entitled to recover—abides throughout the case with the plaintiff."

From the views herein expressed it will be seen that the court erred in excluding the hospital chart; although we are unable to say that it is injurious and reversible, the chart not being before us. There was reversible error in granting the plaintiff's third, fourth and fifth prayers. These errors require a reversal of the judgment.

*Judgment reversed, with costs to the appellant.*

OFFUTT, J., concurs in the result.