545 A.2d 27

**STATE of Maryland**

v.

**Gary Ray GARLICK.**

**No. 159, Sept. Term, 1987.**

Court of Appeals of Maryland.

Aug. 2, 1988.

Ann E. Singleton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for appellant.

Mark Colvin, Asst. Public Defender (Alan H. Murrell, Public Defender, both on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

ADKINS, Judge.

We revisit today a question we addressed four years ago in *Moon v. State*, 300 Md. 354, 478 A.2d 695 (1984), *cert. denied*, 469 U.S. 1207, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985): Is the constitutional right of confrontation violated by the admission into evidence of a hospital record containing laboratory test results unless the technician who conducted the test is produced as a witness? In *Moon*, we answered the question in the affirmative. We do not retreat from our holding in *Moon*, but because of substantial differences between the record in that case and this, we here respond to the question in the negative.

### *Factual Background*

In the pre-dawn hours of 16 June 1985, a toll collector at the Chesapeake Bay Bridge near Annapolis was giving change to an eastbound motor vehicle. At that same time a second vehicle, driven by respondent Gary Ray Garlick (Garlick), traveling east on U.S. 50 at a high rate of speed, swerved from one lane to another and ran into the rear of the car stopped at the toll plaza. The force of the collision propelled both cars through the toll booth. Within minutes a Maryland Toll Facilities police officer arrived on the scene. He noted that Garlick was "extremely incoherent" and had "great difficulty" producing requested identification papers. Garlick's girlfriend stated her companion had

been drinking earlier in the evening and taking valium and that they "would find out that he was taking other things or involved in other things." Garlick was placed under arrest. He was charged with (1) failure to reduce speed to avoid an accident (Md. Code (1987 Repl. Vol.), § 21–801(b) of the Transportation Article); (2) failure to stop and render aid (§ 20–102); and (3) driving or attempting to drive while under the influence of a controlled dangerous substance (§ 21–902).

The police officer took Garlick to the Anne Arundel General Hospital where he refused treatment, but consented to a blood test. The test showed no alcohol in his blood. Garlick was then transported to the Anne Arundel County Detention Center which refused to accept custody without a hospital release because a bump had arisen on Garlick's head. Garlick was returned to the hospital where he then agreed to treatment.

In the emergency room, Dr. Joel R. Buchanan, Jr., a board certified emergency room physician, examined Garlick and found him to have a swollen nose and forehead, with tenderness at the base of his neck. Garlick acted slightly lethargic, his speech was slurred, and his coordination was poor. To find out why Garlick's neurologic examination was not normal, Dr. Buchanan ordered a toxicological screen of his blood and urine. The doctor also ordered x-rays of Garlick's neck and skull and a CAT (computerized axial tomography) scan of his head and neck. The test results indicated that Garlick had a fracture at the base of his neck, his head scan was totally normal, but his blood screen showed the presence of phencyclidine (PCP).

On 25 November 1986 Garlick was tried in the Circuit Court for Anne Arundel County (Lerner, J.) on the three charges previously noted. Months before trial, he had been given a copy of the emergency services report, which included a notation of the positive PCP laboratory result. He did not receive, however, a supplementary laboratory technician's report until the day of trial. At trial the hospital technician was not present, and the technician's report was

suppressed. Dr. Buchanan did appear as a witness and the emergency services report, including the test results, was admitted into evidence.

Although at first agreeing that "[i]f that report was admissible under a business record exception, it should come in," Garlick objected later to the admission of the emergency room report. It had references to the results of the hospital laboratory tests, which he considered inadmissible, since the technician was not present and the laboratory report was not admitted. His objections were overruled. The court acquitted Garlick of the charge of failing to stop and render aid but found him guilty of driving while under the influence of a controlled dangerous substance and of failure to reduce speed to avoid an accident. He was sentenced to 60 days and fined $300.

The Court of Special Appeals held it was error to admit evidence showing the result of the toxic screen test and reversed Garlick's conviction. *Garlick v. State*, No. 12, Sept. Term, 1987 (filed 23 September 1987) (unreported). We granted the State's petition for a writ of certiorari to consider the important question presented. 311 Md. 445, 535 A.2d 921 (1988).

## I. *Confrontation*

Article 21 of the Maryland Declaration of Rights provides that "in all criminal prosecutions, every man hath a right ... to be confronted with the witnesses against him...." In a similar vein, the sixth amendment to the United States Constitution declares that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." [1] Garlick argues that admitting the hospital record without producing the hospital technician as a witness violated these rights of confrontation. We disagree.

---

1. The sixth amendment is made applicable to the states via the fourteenth amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

We have identified "the concept of confrontation as a device to advance the search for truth." *Wildermuth v. State,* 310 Md. 496, 510, 530 A.2d 275, 282 (1987). And the Supreme Court has said that confrontation "(1) insures that the witness will give his statements under oath ...; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness making his statement...." *Lee v. Illinois,* 476 U.S. 530, 540, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514, 526 (1986) (quoting *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489, 497 (1970)). But as we pointed out in *Wildermuth,* "our predecessors permitted the use of certain documentary evidence at trial." 310 Md. at 512, 530 A.2d at 283 (citing *Johns v. State,* 55 Md. 350 (1881)). The Supreme Court also has said

> the privilege of confrontation [has not] at any time been without recognized exceptions, as for instance dying declarations or documentary evidence.... The exceptions are not even static, but may be enlarged from time to time if there is no material departure from the reason of the general rule.

*Snyder v. Massachusetts,* 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674, 679 (1934) [citations omitted].

In *Moon v. State,* Judge Cole, for the Court, conducted a comprehensive review of Maryland and Supreme Court interpretations of the confrontation right vis-à-vis the hearsay rule. That examination yielded this conclusion:

> [t]he Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay..... [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability."

*Moon,* 300 Md. at 367–368, 478 A.2d at 701–702 (quoting *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–

2539, 65 L.Ed.2d 597, 607–608 (1980)). Nevertheless, there are certain types of evidence that are "so intrinsically reliable that requiring production of the declarant may be difficult, if not pointless." *Moon,* 300 Md. at 365, 478 A.2d at 701 (citing *e.g.,* business records, and *Dutton v. Evans,* 400 U.S. 74, 95–96, 91 S.Ct. 210, 223, 27 L.Ed.2d 213, 231 (1970) (Harlan, J., concurring) ("production would be unduly inconvenient and of small utility to a defendant")). Judge Cole pointed to circumstances

> where the courts have found no confrontation violation because the evidence to be offered is clothed with substantial indicia of reliability. Such evidence is admitted without the declarant's testimony when producing the witness would likely prove unavailing or pointless. Business and hospital records fall within this category and generally the hearsay exception which allows their admission is expressed by statutory enactment.[2]

*Moon,* 300 Md. at 369, 478 A.2d at 702–703.

In *Moon,* however, we did not apply the rule permitting the admission of very reliable hearsay evidence without the testimony of the declarant. But the record in *Moon* manifested serious indicia of unreliability of the test. These indicia included a three-day lag between the date on which the blood sample was taken and the date on which it was analyzed; the absence of Moon's name on the report; and the fact that the tests were conducted after the treatment for which they were requested had been performed. *Id.* at 371–372, 478 A.2d at 703–704. Under these circumstances, we held that the testimony of the technician (the declarant), who was present, in court would be "neither frivolous nor pointless." *Id.* at 370–371, 478 A.2d at 703. As a conse-

---

**2.** *See Bourjaily v. United States,* —— U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (co-conspirator exception to hearsay rule is so firmly rooted in jurisprudence that no independent inquiry into reliability is necessary when considering confrontation claim, even though co-conspirator is not available for trial.) *See also United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986).

quence, we held the report inadmissible absent testimony of the technician.

■ This case, on the other hand, involves the business records exception to the hearsay rule. Md. Code (1987 Repl. Vol.), § 10–101 of the Courts and Judicial Proceedings Article. As we shall now demonstrate, that statutory exception is solidly grounded on concepts of reliability. Moreover, nothing in the record now before us raises substantial questions about the reliability of the tests performed in connection with Garlick's emergency room treatment.[3]

## II. *Hospital Records Admissibility*

■ The business records exception to the rule against hearsay, under which hospital records are included, "properly administered ... would seem to be among the safest of the hearsay exceptions." *Ohio v. Roberts*, 448 U.S. 56, 66 n. 8, 100 S.Ct. 2531, 2539 n. 8, 65 L.Ed.2d 597, 608 n. 8 (1980) (quoting Comment, "Hearsay, The Confrontation Guarantee and Related Problems," 30 La.L.Rev. 651, 668 (1970)). *See also United States v. Leathers*, 135 F.2d 507, 511 (2d Cir.1943) ("We think that business records kept as a matter of ordinary routine are often likely to be more reliable than dying declarations").[4]

This exception was derived from the common law "shop book" rule. *McCormick on Evidence* § 305 (E. Cleary 3d ed. 1984) (hereinafter McCormick). *See also*, Powell, "Admissibility of Hospital Records into Evidence," 21 Md.L. Rev. 22, 30 (1961) (hereinafter Powell). Maryland has rec-

---

**3.** It appears that the test performed in this case was the enzyme multiple immunassay technique (E.M.I.T.). In his brief, Garlick attempts to attack the reliability of this test, but having totally failed to raise this issue in the trial court, he cannot do so now. Md.Rule 885.

**4.** Dying declarations have long been an exception to the hearsay rule, existing even before the confrontation provisions were included in the Bill of Rights. *See, Kirby v. United States*, 174 U.S. 47, 61, 19 S.Ct. 574, 579, 43 L.Ed. 890, 896 (1899); *Mattox v. United States*, 156 U.S. 237, 243, 15 S.Ct. 337, 340, 39 L.Ed. 409, 411 (1895); and *McCormick on Evidence* § 252 (E. Cleary 3d ed. 1984).

ognized the derivation of the business records exception and its coverage of hospital records.

An early case admitting hospital records, even without producing as a witness the person with knowledge of the entries, was *Globe Indemnity Co. v. Reinhart*, 152 Md. 439, 137 A. 43 (1927). In *Globe*, the Court analyzed the general rule applicable to a book of account, stated in *Cohen v. Bogatzky*, 149 Md. 134, 131 A. 31 (1925). The Court found that the hearsay exception was grounded on the "circumstantial guarantee of trustworthiness of the record itself, and upon the inconvenience and well-nigh impossibility of producing witnesses who could from their own personal knowledge testify to the truth of the entries made." *Globe*, 152 Md. at 446, 137 A. at 45. The Court concluded that the evidence represented by a hospital chart contained a sufficient guarantee of its truthfulness. Our predecessors went on to say:

> [the hospital chart] is a record required by the hospital authorities to be made by one whose duty it is to correctly make the entries therein contained. So far as the hospital is concerned, there could be no more important record than the chart which indicates the diagnosis, the condition, and treatment of the patients. This record is one of the important advantages incident to hospital treatment, for it not only records for the use of the physician or surgeon what he himself observes during the time he is with the patient, but also records at short intervals the symptoms, condition, and treatment of the patient during the whole time of the physician's absence. Upon this record the physician depends in large measure to indicate and guide him in the treatment of any given case. Long experience has shown that the physician is fully warranted in depending upon the reliability and trustworthiness of such a record. It is difficult to conceive why this record should not be reliable. There is no motive for the person, whose duty it is to make the entries, to do other than record them correctly and accurately. On the other hand, there is the strongest reason why he should: First,

because of the great responsibility, he knowing that the treatment of the patient depends largely upon this record, and if it be incorrect it may result, and probably will result, in the patient's failure to receive proper surgical or medical treatment, which failure might be followed by serious consequences or even death. Second, the entrant must realize and appreciate that his position is dependent upon the accuracy with which the record is made. Third, as was stated by Tindall, C.J., in *Poole v. Dicas*, 1 Bing. [ (N.C.) 649, 653, 131 Eng.Rep. 1267, 1269 (1835) ]:

> "[I]t is easier to state what is true than what is false; the process of invention implies trouble[,] in such a case unnecessarily incurred."

*Globe,* 152 Md. at 446–447, 137 A. at 46.

That basic attitude towards hospital records and business records in general has never really changed. With applications of the older law, however, a mass of "detailed petty limitations" and technicalities had gradually developed. 5 J. Wigmore, *Evidence* § 1561a (Chadbourn rev. ed. 1974) (hereinafter 5 Wigmore). Therefore, in order to enlarge the scope of the "shop book" rule and liberalize the rules for "business records of composite authorship," modern statutes were enacted. These statutes were for the most part based on a model act for Proof of Business Transactions (Model Act), published in 1927 by a committee of experts appointed by the Commonwealth Fund of New York,[5] or on the Uniform Act on Business Records recommended by the Committee on Evidence Acts and approved in 1936 by the National Conference of Commissioners on Uniform State Laws. *See* 5 Wigmore, § 1561a; and Powell, *supra*, 21 Md.L.Rev. at 31–33.

---

**5.** E. Morgan, Chairman, *The Law of Evidence: Some Proposals for Its Reform,* Ch. 5 at 63 (1927) (cited in *Hoffman v. Palmer,* 129 F.2d 976, 984–986 (2d Cir.1942), *aff'd,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), and 5 J. Wigmore, *Evidence* § 1561a (Chadbourn rev. ed. 1974)).

In 1929 Maryland became one of the first states to adopt the broader-languaged Model Act as § 54A of Article 35.[6] Chapter 517 of the Acts of 1929. *Also see, Beth. Shipyard v. Scherpenisse,* 187 Md. 375, 380–381, 50 A.2d 256, 259–260 (1946), and 6 L. McLain, *Maryland Practice: Maryland Evidence* § 803 (6).1, at 376–377 (1987) (hereinafter 6 McLain). The current substantively unchanged version is codified as Md.Code (1984 Repl.Vol.), § 10–101 of the Courts and Judicial Proceedings Article. It reads:

(a) *Definition of "business".*—"Business" includes business, profession, and occupation of every kind.

(b) *Admissibility.*—A writing or record made in the regular course of business as a memorandum or record of an act, transaction, occurrence, or event is admissible to prove the act, transaction, occurrence, or event.

(c) *Time of making records.*—The practice of the business must be to make such written records of its acts at the time they are done or within a reasonable time afterwards.

(d) *Lack of knowledge of maker.*—The lack of personal knowledge of the maker of the written notice may be shown to affect the weight of the evidence but not its admissibility.

We recognized that "[w]hatever the rule at common law, the statute was clearly intended to liberalize the common law rules on the subject." *Morrow v. State,* 190 Md. 559, 562, 59 A.2d 325, 326 (1948). *See also* Powell, *supra,* 21 Md.L.Rev. at 32–33 & n. 47, and *Hoffman v. Palmer,* 129 F.2d 976, 984–989 (2nd Cir.1942), *aff'd,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943). And we applied the statute to hospital records. For example, the Court in *Beth. Shipyard* said:

---

**6.** The United States Congress also used the Model Act as a model for its federal business records act, Act of 20 June 1936, Ch. 640, § 1, 49 Stat. 1561 (codified at 28 U.S.C. § 695 (1940), current revised version at 28 U.S.C. § 1732 (1982)). *See also* Title 28, Appendix—Rules of Evidence, Rule 803(6) (1982).

Under the broad language of this Act, we find no error in the admission in evidence of the hospital record in the court below. The Act applies to every business, profession, occupation and calling of every kind. The Act also provides that all other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight, but not the admissibility thereof. The purpose of the Act is to put an end to narrowness in the use of the familiar rule of evidence that the person whose statement is received as testimony should speak from personal observation or knowledge, and to bring the rule of evidence nearer to the standards in responsible action outside of the courts. 5 Wigmore on Evidence, 3d Ed., Sec. 1530a. Therfore, this Court holds that a hospital record containing the history of a patient's case is admissible in evidence, whether or not the statements therein were made by the patient himself.

187 Md. at 381, 50 A.2d at 260. *See also Dietz v. Moore,* 277 Md. 1, 7, 351 A.2d 428, 432 (1976); *Dunn v. State,* 226 Md. 463, 478, 174 A.2d 185, 192 (1961); *Yellow Cab Co. v. Hicks,* 224 Md. 563, 570, 168 A.2d 501, 504 (1961); and *Jones v. State,* 205 Md. 528, 531, 109 A.2d 732, 734 (1954). In *Jones* it was also noted that the statute applied to criminal as well as civil cases and was not unconstitutional under Article 21 of the Maryland Declaration of Rights. *Id.* at 532, 109 A.2d at 735.

This is not to say, however, that there have not been some hospital records (or more precisely some entries within those records) that have been objectionable or found to have been inadmissible. For example, in *Gregory v. State,* 40 Md.App. 297, 325, 391 A.2d 437, 454 (1978), the medical staff conference summary containing the opinions of several psychiatrists was not admissible without their testimony. The court stated:

The mere fact that a document is part of a hospital record made in the ordinary course of the hospital's business, and may therefore be admissible under the hearsay rule,

does not *ipso facto* make its admission comply with the confrontation requirement....

We have here not the routine record of a person's birth, or death, or body temperature, not any other similar statement of fact or condition objectively ascertained, generally reliable and normally undisputed, and free from any motive to record falsely. We are dealing with the opinions of supposed expert witnesses, who, in this document, are giving testimony not only as to appellant's mental condition, but, more importantly, as to whether or not he is criminally responsible.

*Id.* at 325–326, 391 A.2d at 454. *See also Dietz*, 277 Md. at 7, 351 A.2d at 433 ("even though a particular hospital record is not barred from evidence as hearsay, it may be that some or all of its contents are open to objection on other grounds" (citation omitted)); *Dunn*, 226 Md. at 478, 174 A.2d at 192 ("specific portions of the record are open to objection under certain circumstances"); and *New York Life Ins. Co. v. Taylor*, 147 F.2d 297, 304 (1945), opinion on rehearing (the diagnosis of a psychoneurotic state which involved conjecture and opinion was inadmissible).

Nevertheless, it is fair to say that the general rule developed by the case law supports the admissibility of properly administered hospital records with the "pathologically germane" entries contained therein, because they are done as part of the hospital's "regular course of business."

"The words, 'regular course of business' ... are not colloquial words but are words of art." *Hoffman v. Palmer, supra*, 129 F.2d at 983. So " 'regular course' of business must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business." *Palmer v. Hoffman*, 318 U.S. 109, 115, 63 S.Ct. 477, 481, 87 L.Ed. 645, 651 (1943). In a hospital the "regular course of business" is to treat people, that is, to care for patients. *New York Life Ins. Co. v. Taylor*, 147 F.2d at 301 (Edgerton, J., dissenting in part). To conduct that business of caring for patients, the making of a hospital record is a

method systematically employed, without which proper care of patients would be impossible. *Id.*

The trustworthiness and reliability of any business record arises from the fact that entries recording an act or event are made in the "regular course of business" and it is the "regular course of business" to record those entries at the time of that act or event or soon thereafter. *See generally,* 6 McLain, *supra,* § 803(6).1, at 381; McCormick, *supra,* § 306; and 5 Wigmore, *supra,* §§ 1522 & 1546. *Also see, New York Life Ins. Co. v. Taylor, supra,* 147 F.2d at 307–308 (Edgerton, J., dissenting in part to the opinion on rehearing); and *People v. Kirtdoll,* 391 Mich. 370, 385–386 & n. 8, 217 N.W.2d 37, 46 & n. 8 (1974). "Ordinarily, hospital records satisfy these criteria and the information they contain is admissible as long as it is pathologically germane." *Pratt v. State,* 39 Md.App. 442, 455, 387 A.2d 779, 787 (1978), *aff'd,* 284 Md. 516, 398 A.2d 421 (1979). So events that are "pathologically germane" to that treatment are within the regular course of the hospital's business and the recordations of those events are admissible under a business record exception.

"Pathologically germane" as that term has been defined includes facts helpful to an understanding of the medical or surgical aspects of the case, within the scope of medical inquiry. "A 'pathologically germane' statement 'must fall within the broad range of facts which under hospital practice are considered relevant to the diagnosis or treatment of the patient's condition.' McCormick, *Evidence,* Ch. 32, § 290." *Yellow Cab, supra,* 224 Md. at 570, 168 A.2d at 504. *See also Lee v. Housing Auth. of Baltimore,* 203 Md. 453, 460, 101 A.2d 832, 835 (1954) ("the occurrence recorded must be 'pathologically germane to the physical or mental condition which caused the patient to come to the hospital for treatment'" (citation omitted)); *Marlow v. Cerino,* 19 Md.App. 619, 635, 313 A.2d 505, 514 (1974) ("'pathologically germane' ... [a]s we construe the term ... means having significant bearing upon and relation to the disease or injury from which one suffers").

Thus, once it is clear that the hospital record was made in "the regular course of business" and the recorded transactions are "pathologically germane to treatment" the record is admissible as an exception to the hearsay rule. *See Old v. Cooney Detective Agency*, 215 Md. 517, 524–525, 138 A.2d 889, 893 (1958) ("This Court has gone far in admitting the particulars set forth in the history of a patient in a hospital record"); and *Scott v. James Gibbons Co.*, 192 Md. 319, 330, 64 A.2d 117, 122 (1949) (records of the history of a patient's case or his physical condition were admissible, where history meant the physical background as well as the present condition of the patient). We shall now see how the entry into Garlick's hospital record of his PCP-positive laboratory test result was so "pathologically germane" to treatment that it was completely admissible without the presence of the laboratory technician as witness.

### III. *The Admission of Garlick's Test*

At trial, the court asked whether an attempt had been made to produce as a witness the hospital laboratory technician. The State answered: "We didn't think it was necessary, Your Honor." Garlick's counsel replied: "If you read Moon, Your Honor, it is necessary." We have already distinguished the facts in *Moon* from those now before us; we shall see that the State was correct in its response.

In the emergency room, we recall, Garlick was treated for head and neck injuries and presented abnormal neurologic symptoms. Dr. Buchanan testified that he ordered a toxicological screen of Garlick's blood and urine to determine the cause of his symptoms.[7] He stated: "[T]he summary of my results, including the CT of the head, indicate that the lack of coordination was a ... what we call a metabolic cause,

---

7. *Cf. State v. Moon*, 291 Md. 463, 466 n. 1, 436 A.2d 420, 421 n. 1 (1981) ("An obvious purpose for the drug test would be for the attending physician to be certain that anything he prescribed would not run counter to that already in his patient's system, just as some pharmacies monitor prescriptions to be certain that the consumer is not using antagonistic drugs").

meaning something that is throughout the body rather th[a]n at one place in the body, i.e., an intoxication."

Although the doctor did not observe Garlick's blood being taken, did not know which technician performed the tests, did not know when the testing equipment was last checked for proper operation, and did not observe if standard procedures had been followed, he said he had no reasons to doubt the accuracy of Garlick's test.

Dr. Buchanan declared "there has never been a mix-up that I know about" involving the technicians at the hospital making "a mistake with regard to examining somebody else's blood." He explained that the tests were "extremely scientific," and an expert technician was required to perform them. He said he relied on the technician to do the test; he received the test results from the hospital laboratory via computer terminal; they were recorded in Garlick's emergency services chart and then relied upon as a basis for the course of treatment and emergency services prescribed for Gary Garlick.[8]

No elaborate chain of custody needs to be established here. The blood sample was not taken for the purpose of litigation. *See Pratt v. State*, 39 Md.App. at 456, 387 A.2d at 787 (the indicia of reliability dissipates if the report is prepared for a purpose other than treatment, especially if prepared in anticipation of litigation); and 6 McLain, *supra*, § 803(6).1, at 382; and *cf., Palmer v. Hoffman*, 318 U.S. at

---

8. *Cf., Sarrio v. Reliable Contract. Co.*, 14 Md.App. 99, 286 A.2d 183 (1972), where the court discussed the entry in the hospital record of an intern's observation of a patient's drunken condition.

Patently, the course of treatment to be accorded [the patient] could be influenced or acutely affected by his condition of intoxication. The notation could only have been intended to alert the treating physicians to a discernible condition of the patient which may not subsequently have been apparent but still could have had harmful residual effects ultimately. Not to have recorded such an observation would conceivably have constituted a dereliction of duty on the part of the intern. Certainly, the failure to have made the recordation would have rendered a disservice to the appellant as a patient in the hospital.

*Id.* at 102, 286 A.2d at 184.

114, 63 S.Ct. at 481, 87 L.Ed. at 650 (the report's primary utility was in litigation and court use, not in the business of railroading). The testing was performed in the hospital and not by a police laboratory. *See, e.g., State v. Henderson,* 554 S.W.2d 117 (Tenn.1977) (inadmissible state laboratory report); and *generally,* Imwinkelried, "The Constitutionality of Introducing Evaluative Laboratory Reports Against Criminal Defendants," 30 Hastings L.J. 621 (1979).[9] And there were no discrepancies apparent on the face of the record. *See Moon,* 300 Md. at 359 & 370–371, 478 A.2d at 697 & 703. Thus no extensive foundation needs to be laid before this hospital report is admissible under the business record exception. The testimony of the emergency room physician showing that the emergency services report was made in the "regular course of business" and that the toxicological screen of Garlick's blood and urine was "pathologically germane to treatment" was sufficient to justify admission. *See Old v. Cooney Detective Agency,* 215 Md. at 525, 138 A.2d at 893 ("We have said that reliability sufficient to justify admission is suggested if the recital in the history is "pathologically germane" to the physical condition which caused the patient to be brought to the hospital for treatment").

It would have been of little utility and of great inconvenience to summon every doctor, nurse, or technician who examined Garlick, took his pulse and blood pressure, drew or screened his urine and blood. Many hospital tests and procedures are performed routinely and their results are relied upon to make life and death decisions.[10] The exam-

9. *But see Robertson v. Cox,* 320 F.Supp. 900 (W.D.Va.1971) (medical report stating a positive chemical test result was admissible into evidence) (citing *Robertson v. Commonwealth,* 211 Va. 62, 175 S.E.2d 260 (1970)); and *State v. Kreck,* 86 Wash.2d 112, 542 P.2d 782 (1975) (state chemist report of results of testing blood for chloroform was admissible).

10. *See Pratt v. State,* 39 Md.App. 442, 456, 387 A.2d 779, 787 (1978), *aff'd,* 284 Md. 516, 398 A.2d 421 (1979) ("Hospital records are considered trustworthy partially because they are routinely used to make

ining doctor relied on these objective scientific findings for Garlick's treatment and never doubted their trustworthiness. Neither do we. This high degree of reliability, as we explained early on, permits introduction of the test results contained in the hospital records presented in this case without any need for showing unavailability of the technician and without producing the technician. Under these circumstances the constitutional right of confrontation is not offended.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY. RESPONDENT TO PAY THE COSTS.

decisions affecting the life and health of the patient"). *See also People v. Kirtdoll,* 391 Mich. 370, 386 & n. 9, 217 N.W.2d 37, 46–47 & n. 9 (1974) (quoting, among others, *Globe Indemnity Co. v. Reinhart,* 152 Md. 439, 137 A. 43 (1927)); and *generally,* 6 J. Wigmore, *Evidence* § 1707 (Chadbourn rev. ed. 1976).